# IN THE SUPREME COURT OF IOWA

No. 14–0298

Filed January 8, 2016

Amended April 6, 2016

**BEN VILLARREAL JR., CLEO MARTINEZ,** and **LaCASA MARTINEZ TEXMEX, INC.,**

Appellants,

vs.

**UNITED FIRE & CASUALTY COMPANY** d/b/a **UNITED FIRE GROUP,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Cerro Gordo County, Rustin T. Davenport, Judge.

An insurer seeks further review of a court of appeals decision reversing a summary judgment granted by the district court in favor of the insurer. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Eric Updegraff and Bruce H. Stoltze of Stoltze & Updegraff, P.C., Des Moines, for appellants.

David L. Phipps, S. Luke Craven, and Stephen E. Doohen of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

**MANSFIELD, Justice**.

A restaurant was severely damaged by fire. The owners made an insurance claim, but much of the claim was denied. They ultimately sued the insurer for policy benefits. They obtained a jury verdict and judgment against the insurer, which the insurer paid. Thereafter, they brought a separate action against the insurer for bad faith, alleging it had lacked a reasonable basis for its prior refusal to pay these benefits. The district court granted the insurer's motion for summary judgment on the basis of claim preclusion. The court of appeals reversed.

On further review, we must now decide whether a final judgment in a breach-of-contract suit between an insured and an insurer for policy benefits bars a later tort action for bad faith alleging that the insurer lacked an objectively reasonable basis for denying the claim. Under the circumstances presented here, we conclude that it does. Accordingly, we vacate the judgment of the court of appeals and affirm the district court's grant of summary judgment to the insurer.

## I. Background Facts and Proceedings.

On March 8, 2007, a fire severely damaged the restaurant La Casa Martinez in Mason City. Plaintiff La Casa Martinez TexMex, Inc., an Iowa corporation, owned the restaurant, and plaintiffs Ben Villarreal, Jr. and Cleo Martinez were officers and shareholders of the corporation. Martinez also owned the building that housed the restaurant. The corporation had purchased commercial property insurance from United Fire & Casualty Company ("United Fire") with coverage limits of $386,400 for building replacement and $374,400 for personal property replacement. The policy also provided business interruption coverage. It listed the insured as La Casa Martinez TexMex, Inc.

The record does not indicate exactly when United Fire was notified of the fire, but it was soon after March 8. At that point, United Fire sent a certified copy of the policy to the insured. Communications between the insured and United Fire continued thereafter. The insured retained local attorney Jim McGuire. On June 12, Christine Friedrich, United Fire's claims representative, met with Villarreal and McGuire at McGuire's office. Three days later, Villarreal provided United Fire with a lengthy inventory of personal property lost in the fire. The total claimed value of the inventory was approximately $490,000.

There was some question initially whether the building should be repaired or replaced. Martinez had purchased the building and land a year and a half earlier for $150,000, and it was currently assessed for property tax purposes at $153,000. However, there was no dispute that Martinez had made significant improvements to the property after buying it, as the property had previously been vacant for two and a half years. Thus, before opening the restaurant, the plaintiffs had replaced the entire roof, the air conditioning, and the water heater; had made significant repairs to the ceiling, the electrical systems, the bathrooms, and the walls; and had repainted the interior and the exterior.

As compensation for business interruption losses, United Fire paid $23,900 at the outset while asking the insured for financial information to support this portion of the claim. Additional business interruption payments were subsequently made totaling approximately $5200.

On June 25, Villarreal faxed a letter to United Fire with a copy to McGuire demanding an immediate additional payment. On June 27, Villarreal and Martinez sent another letter to Friedrich, demanding immediate payment of $100,000. The letter threatened prompt legal action if the payment was not received and stated in part:

> Throughout this process, you have been aware of our continuing downward skid as I have verbally kept you informed of our continuing deteriorating situation and pleas for relief. I will reiterate, we have become impoverished due to your flagrant disregard for our, the customer, welfare, intentional delays, erroneous disbursal of information, lack of returned phone calls to me and my wife and intentional/and/or neglectful handling/servicing of this claim.
>
> Ms. Fried[]rich, your actions, and/or lack thereof, have displayed unprofessionalism as well as ethical and ethnic discrimination.

McGuire was copied on the letter.

On August 16, McGuire sent a letter to United Fire stating that his clients must be paid or "I have no alternative but to file suit for damages which you are responsible for in connection with the fire as well as damages for bad faith on the part of your company." Friedrich's supervisor responded on August 27 that the insured had a responsibility to provide proof of losses and the information received by United Fire to date was "inaccurate or incomplete."

On September 12, McGuire sent another letter to Friedrich, maintaining that United Fire "had intentionally delayed the negotiations in settlement of this claim." The letter added, "I also feel that there has been bad faith on the part of your company for some reason or other by intentionally delaying the settlement of this loss."

On October 11, as authorized by the policy, United Fire took statements under oath from Martinez and Villarreal in the presence of McGuire. Martinez and Villarreal testified that improvements totaling $83,500 had been made to the building after the purchase. However, no documentation had been provided at that point to the insurer for the majority of these improvements.

By then, United Fire had paid $24,000 toward the insured's personal property losses. In November, United Fire made a building-related payment of $108,310 that covered only the mortgage balance and therefore went entirely to the mortgagee. This of course meant the insured itself still had received nothing for the loss of the building.

On December 5, McGuire wrote Friedrich a letter seeking $35,173 for lost net profits to the business, $102,000 for payments the officers had not received from the business, an additional $193,054 for the value of the building, and $88,910 for additional, previously unreported contents of the building. The letter added, "In view of the fact that there has been such a long delay in settling, I would ask that we receive the requested drafts within seven days from the date of this letter."

Friedrich responded, stating among other things that she would like to hire an appraiser to look at the property. She also complained in a separate email about needing more information from the insured concerning the business interruption claim. On December 27, McGuire sent an email to Friedrich stating,

> That is bull shit, Christine. We have given them more than they need and they are intentionally delaying this and have for months!!! They have a duty to treat their insured fairly, not to find ways to deny them of the money that is long over due.

On January 9, 2008, Friedrich replied by letter that United Fire did not owe any additional amounts for business interruption, although it offered to settle this aspect of the claim for $15,000. Regarding the building, Friedrich asserted that the best indicator of its value was the 2006 assessed value of $112,000, "which is also supported by the total purchase price of $150,000 in late 2005 for the structure and the land." Friedrich further acknowledged that her "calculations show that the

amount spent on [upgrades to the building] is roughly $45,000." However, she offered to pay only $20,000 for the building in addition to the prior mortgage payoff.

As for the personal property, Friedrich explained that United Fire had already paid $84,638.79 for these losses. She offered to pay another $20,000 in return for a release "to close this out."

In response, McGuire provided Friedrich with an appraisal showing the market value of the building to be $388,200—or approximately $280,000 more than United Fire had paid for this part of the loss. On January 28, 2008, Friedrich indicated that she would refuse to do anything further. She informed McGuire that "United Fire Group is maintaining its [actual cash value] payment at the $108,310.00 already paid to the insured and an additional $20,000.00 for the improvements made."

On March 7, 2008, La Casa Martinez TexMex, Villarreal, and Martinez filed a breach-of-contract action against United Fire to recover under the insurance policy. During the course of the litigation, plaintiffs abandoned any claim for business interruption damages but continued to assert claims that United Fire had underpaid for the building and personal property.

Nearly three years later, trial commenced on March 1, 2011.[1] During her trial testimony, Friedrich admitted she had never determined an actual cash value for the building. On March 4, 2011, a jury returned verdicts for the plaintiffs in the amount of $176,690 for the additional unpaid value of the building and $60,212 for the additional personal

---

[1]The case was dismissed once by operation of Iowa Rule of Civil Procedure 1.944 but later reinstated.

property loss—a total of $236,902. Later that month, United Fire paid this amount plus interest and costs, and received a satisfaction of judgment.

On June 20, approximately three months after judgment was entered in the breach-of-contract case and more than four years after the fire, La Casa, Villarreal, and Martinez filed the present action in one count for "bad faith." They alleged that United Fire "had no objective reasonable basis for denying or failing to make payment on the [building and personal property] insurance claims"; that United Fire "knew it had no objective reasonable basis for the denial or failure to make payment"; and that this bad faith caused them "lost profits, lost wages, [and] emotional distress."

United Fire filed a motion to dismiss based on claim preclusion, which the district court denied on February 24, 2012. Discovery then proceeded. Trial was originally scheduled for January 15, 2013. On November 14, 2012, United Fire filed a motion for summary judgment. Then on November 20, United Fire filed a motion for a continuance. The court granted the continuance over the plaintiffs' resistance. Its order noted that "[s]ubstantial matters need to be addressed prior to trial including ruling on Defendant's Motion for Summary Judgment." Upon receipt of this order, United Fire withdrew its pending motion for summary judgment without prejudice.

The plaintiffs then filed a motion for removal from application of Iowa Rule of Civil Procedure 1.944, which was granted by the court.[2]

___

[2]Rule 1.944(1) provides, "[E]very civil and special action . . . shall be brought to issue and tried within one year from the date it is filed and docketed and in most instances within a shorter time." Iowa R. Civ. P. 1.944(1). Accordingly, a "case will be subject to dismissal if not tried prior to January 1 of the next succeeding year pursuant to this rule." *Id.* r. 1.944(2).

The court's order stated, "Pursuant to rule 1.944 dismissal will not occur until January 1, 2014." Trial was later set for January 28, 2014. However, after the trial was rescheduled, no effort was made to move the January 1 dismissal deadline.

At Friedrich's deposition on November 19, 2013, she acknowledged that during the underwriting process United Fire had obtained a valuation report of $249,744 for the building. Although a United Fire supervisor had instructed Friedrich to schedule an appraisal of the building in December 2007, no appraisal was ever performed. Friedrich's notes and a memo to her supervisor indicated that she thought the improvements to the building were worth $71,744.83 although she communicated to Villarreal and Martinez that United Fire estimated the improvements at $45,000 and only increased United Fire's offer by $20,000 for the improvements (conditioned on a settlement).

Meanwhile, on November 6, 2013, United Fire had refiled its motion for summary judgment, maintaining that the bad-faith claim was barred by claim preclusion as a matter of law, that Martinez and Villarreal were not proper parties in interest, and that the bad-faith claim failed as a matter of law. On December 3, the plaintiffs resisted United Fire's motion for summary judgment. On December 13, the motion was heard by the court and submitted.

On January 7, 2014, having not yet decided the summary judgment motion, the court entered an order noting that the case had been dismissed by operation of law on January 1 pursuant to rule 1.944.

Six days later, on January 13, the plaintiffs moved to reinstate the case. United Fire opposed the motion, pointing out that nearly seven years had elapsed since the fire and that—due to the delays in the litigation—several of its witnesses had retired and were no longer within

its control, one witness was now deceased, and one was having serious health problems that might make him unavailable. Nonetheless, on January 28, the court granted the plaintiffs' motion. It pointed out that both parties had taken part at the trial setting conference which selected the new trial date to occur after January 1.

Yet, that same day, the district court granted United Fire's motion for summary judgment. The court found the bad-faith action was barred by claim preclusion, stating,

> [B]oth [the breach-of-contract and bad-faith] claims arise from the March 8, 2007, fire loss, and United Fires' refusal to pay the claim. Both claims depend upon the proper amount United Fire should have paid under its policy, and whether United Fire had a valid basis to support its evaluation of [the restaurant].

However, the court added that

> if the plaintiffs brought their bad faith claim with the breach of contract claim, it is likely that the bad faith action would have been bifurcated from the breach of contract case. It is also likely that plaintiffs would have been denied access to the adjuster's file until the breach of contract case had been fully tried. Even if the cases were brought together, a second trial might ultimately be necessary.

The court also "question[ed] whether both claims could be tried to the same jury." Nonetheless, the court found that "bringing both claims at once would allow a quicker resolution of both cases." The court went on to reach the remaining issues, holding that Villarreal and Martinez were not proper parties, and that fact issues existed as to whether United Fire had breached its duty of good faith and fair dealing.

The plaintiffs appealed, and we transferred the case to the court of appeals. In a panel decision, the court of appeals reversed the district court's judgment, holding the bad-faith action was not barred by claim preclusion and United Fire was barred by issue preclusion from

challenging the standing of Martinez and Villarreal. One judge on the three-judge panel dissented and would have affirmed the district court's ruling that claim preclusion barred the bad-faith action.

We granted United Fire's application for further review.

**II. Standard of Review.**

We review summary judgment rulings for corrections of errors at law. *Sanon v. City of Pella*, 865 N.W.2d 506, 510 (Iowa 2015). Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015).

**III. Analysis.**

**A. Iowa Law of Claim Preclusion.** "The Iowa law of claim preclusion closely follows the Restatement (Second) of Judgments." *Shumaker v. Iowa Dep't of Transp.*, 541 N.W.2d 850, 852 (Iowa 1995). Accordingly, we have previously discussed and relied upon the Restatement (Second) of Judgments in determining whether an action is barred by claim preclusion. *See, e.g.*, *Pavone v. Kirke*, 807 N.W.2d 828, 837 (Iowa 2011); *West v. Wessels*, 534 N.W.2d 396, 398 (Iowa 1995); *Leuchtenmacher v. Farm Bureau Mut. Ins. Co.*, 460 N.W.2d 858, 860 (Iowa 1990); *Lowery Invs. Corp. v. Stephens Indus., Inc.*, 395 N.W.2d 850, 853 (Iowa 1986); *Noel v. Noel*, 334 N.W.2d 146, 148 (Iowa 1983).[3]

---

[3]The Restatement (Second) of Judgments—with its emphasis on a transactional approach to claim preclusion—was published in 1982. Prior to that time, we used a "same-evidence" approach to claim preclusion, although this did not mean we would decline to find claim preclusion just because *some* evidence in the second lawsuit was different. For example, in *B & B Asphalt Co. v. T.S. McShane Co.*, we held that the plaintiff, who had sued the defendants unsuccessfully for fraud over an allegedly defective asphalt plant, could not bring a new action for express warranty, implied warranty, and negligence. 242 N.W.2d 279, 287 (Iowa 1976). Obviously, proving a breach of warranty or negligence would have entailed *some* different evidence from proving a fraud, but we said that "[c]laim preclusion is plainly applicable" because "the

For example, in *Pavone*, we held that claim preclusion barred a management company's action against a casino operator for breach of contract based on the operator's failure to negotiate in good faith for management services for a Clinton casino. 807 N.W.2d at 830–32, 839. Previously, the management company had sued the casino operator for breach of contract based on the latter's failure to negotiate in good faith concerning management services for its Emmetsburg casino. *Id.* at 831. Although the license for the Clinton casino was not even *awarded* until after the first action over the Emmetsburg casino had been filed, we held that once the casino repudiated its underlying contract with the management company, the management company was obligated to claim all damages past and prospective arising out of that repudiation. *Id.* at 831, 837–38.

In doing so, we relied in part on Restatement (Second) of Judgments section 24. *Id.* at 837. It provides,

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and

---

same evidence would be probative in both actions. They arise from the same transaction and depend on evidence of the same events." *Id.*

Since we began citing the Restatement (Second) of Judgments, we have also continued to discuss and apply the older "same-evidence" test in tandem with the more recent transactional approach of the Restatement. *See, e.g.*, *Pavone*, 807 N.W.2d at 836–39 (applying both approaches). What we have not done in the past is use the same-evidence test to reach a *different* result from that under the Restatement.

whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Restatement (Second) of Judgments § 24, at 196 (Am. Law Inst. 1982) [hereinafter Restatement (Second)].

The comments to section 24 elaborate on this transactional approach:

> The expression "transaction, or series of connected transactions," is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.
>
> . . . .
>
> In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded. But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series.

*Id.* cmt. *b*, at 198–99.

The comments also make clear that a "[t]ransaction may be single despite different harms, substantive theories, measures or kinds of relief." *Id.* cmt. *c*, at 199.

In *Leuchtenmacher*, we applied the law of claim preclusion in the context of an alleged bad-faith failure to settle by an underinsured motorist (UIM) carrier. 460 N.W.2d at 859. In that case, the insured was killed in a collision with a vehicle operated by another individual. *Id.*

Her estate sued both the tortfeasor and her own insurer for UIM benefits. *Id.* The jury returned a verdict for $223,251.57. *Id.* The court then entered a judgment against the insurer for $97,263, representing the remaining policy limit for UIM benefits. *Id.*

At this point, the estate sued the decedent's insurer, alleging "it had acted in bad faith by denying the estate's claim for [UIM] benefits, thus forcing the estate to go to trial." *Id.* The insurer moved to dismiss for failure to state a claim, "on the theory that an action for bad-faith failure to settle must be brought simultaneously with the claim to recover the policy proceeds, and a bad-faith claim not so joined is barred by claim preclusion." *Id.* The district court sustained the motion to dismiss, but we reversed. *Id.* at 859, 861. In our analysis, we quoted (as we have done above) from the main text of section 24 of the Restatement (Second) and from comment *b*. *Id.* at 860. After noting that on a motion to dismiss, it would not be proper to consider the record of the other case without an agreement of the parties, we concluded,

> The question of whether the estate's "bad-faith" case was precluded by the prior suit depends on whether the cases arose out of the same facts. We cannot conclude as a matter of law that they did. In fact, a bad-faith claim might well be based on events subsequent to the filing of the suit on a policy and therefore could not be based on the "same" facts. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

*Id.* at 861.

*Leuchtenmacher* involved a motion to dismiss where we could not consider the record of the first proceeding. Thus, it is procedurally distinguishable from the present case. Although we said—correctly—in *Leuchtenmacher* that claim preclusion turns on whether two cases arise out of the "same facts," we did not say that there must be *perfect overlap* between the evidence required to support the respective legal theories in

the two cases. That, of course, would be inconsistent with the Restatement passages we had just quoted at length in *Leuchtenmacher.* *See* Restatement (Second) § 24(1), at 196 ("[T]he claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."); *id.* § 24 cmt. *b,* at 199 (stating that the second action should ordinarily be precluded if there is "a substantial overlap" in witnesses and proof with the first proceeding, and may be precluded "even when there is not a substantial overlap"); *see also Pavone,* 807 N.W.2d at 838 (noting that the second action would involve "much of the same relevant evidence"). Still, *Leuchtenmacher* does indicate that a bad-faith claim based on events subsequent to the filing of a breach-of-contract claim would not be precluded by a judgment in the breach-of-contract case. *See* 460 N.W.2d at 861. Yet here, the bad-faith case was based on events that occurred before March 7, 2008, when the breach-of-contract case was filed.

We believe, therefore, that *Leuchtenmacher* does not control the present case and that it would be prudent to look at authorities in other states, particularly those like Iowa, that have followed the Restatement (Second).

**B. The Prevailing Approach Taken by Other Jurisdictions to Claim Preclusion in First-Party Bad-Faith Insurance Lawsuits**. The great majority of jurisdictions take the view that a breach-of-contract verdict in favor of the insured and against his or her insurer precludes a subsequent action for first-party bad faith, at least where the bad-faith claim is based on events that predate the filing of the breach-of-contract lawsuit. We will review some representative cases.

In *Salazar v. State Farm Mutual Automobile Insurance Co.*, the Colorado Court of Appeals applied the Restatement's transactional approach and held that an insured's bad-faith claim, which was filed after the insured obtained a judgment awarding her UIM policy benefits, was barred by claim preclusion. 148 P.3d 278, 279, 281–82 (Colo. App. 2006). The court noted the essence of Salazar's bad-faith claim was State Farm's "evaluation of her UIM claim" and its refusal to offer more than $100 in settlement. *Id.* at 279, 281. The court added that this outcome would serve efficiency goals. *Id.* at 282. Instead of having much of the evidence repeated, one could have a bifurcated trial where the common facts were presented first, and then the jury could proceed to the bad-faith claim if it found the insurer had breached its contract to pay insurance benefits. *See id.* For these reasons, the court affirmed summary judgment for the insurer. *Id.*

*Powell v. Infinity Insurance Co.* was an uninsured-motorist (UM) case. 922 A.2d 1073, 1076 (Conn. 2007). The insureds sued the UM carrier for policy benefits in the original lawsuit, obtaining damage verdicts well in excess of policy limits, which were then reduced to policy limits for purposes of the final judgment. *Id.* Subsequently, they sued the carrier for, among other things, bad faith. *Id.* They alleged that the defendant, prior to and during the course of the prior lawsuit, had acted unreasonably in refusing to settle for policy limits. *Id.* at 1076–77. The district court granted summary judgment based on res judicata. *Id.* at 1077.

On appeal, the Connecticut Supreme Court affirmed. *Id.* at 1084. Applying the transactional test from section 24 of the Restatement (Second), the court explained,

> [T]he bad faith and [statutory unfair-practices] counts in action II also arise out of the defendant's refusal to pay the policy benefits despite its contractual obligations. The plaintiffs consistently have complained of the defendant's wrongful failure to honor its obligation to make payments in accordance with the terms of the uninsured motorist insurance policy issued to Powell. Their claims turn on essentially one event—the defendant's refusal to pay in accordance with the terms of Powell's policy.

*Id.* at 1081. Although some of the conduct on which the plaintiffs relied for their bad-faith and statutory claims did not arise until after the first lawsuit was commenced, the court noted that this "merely constitute[d] *additional* evidence in support of their claims." *Id.* at 1082. And "even [i]f the plaintiffs did not form a belief" the defendant had acted in bad faith before bringing the suit for policy benefits, they could have amended their complaint before trial. *Id.* (alteration in original) (internal quotation marks omitted).

In *McClain ex rel. Rutledge v. James*, the Missouri Court of Appeals cited Restatement (Second) section 24 and held as follows:

> In [a prior case], Northern sought damages from his insurer PDA for failing to properly defend, protect, and indemnify him against McClain's malpractice claims. His theory was breach of contract. He won a money judgment against PDA, now final.
>
> Here, Northern again seeks damages from his insurer PDA for failing to properly defend, protect, and indemnify him against McClain's malpractice claims. His new theories are "bad faith" (Count VIII), "negligent claims handling" (Count IX), and "breach of fiduciary duties" (Count X).
>
> Northern's new counts violate *res judicata'*s bar on claim splitting. Summary judgment was proper as to these counts.

453 S.W.3d 255, 266 (Mo. Ct. App. 2014) (citations omitted).

In *Viscusi v. Progressive Universal Insurance Co.*, the Wisconsin Court of Appeals found that claim preclusion barred a subsequent bad-faith claim after the insured had recovered insurance benefits in his

initial breach-of-contract case. No. 2009AP942, 2010 WL 94024, at *1–2 (Wis. Ct. App. Jan. 12, 2010). The court stated, "Simply put, both the breach of contract and bad faith claims flow from the same nexus of facts: Progressive's failure to pay policy benefits . . . ." *Id.* at *2. The court added, "According to the Restatement, it is also of no consequence that Viscusi would be required to present additional facts to support his bad faith claim." *Id.*

Perhaps the most cited authority in this area is the First Circuit's decision in *Porn v. National Grange Mutual Insurance Co.*, 93 F.3d 31 (1st Cir. 1996). In that case, an insured successfully sued for breach of contract when his insurer refused to pay UIM benefits following a car accident, and then brought a separate action for bad faith in the handling of his claim six months later. *Id.* at 32. The First Circuit affirmed summary judgment on the ground the bad-faith claims were subject to claim preclusion. *Id.* The court first cited the relevant principles from the Restatement (Second). *Id.* at 34. It then found those rules supported a determination that the second lawsuit was barred. *Id.* at 34–37. As the court noted,

> Porn expends considerable effort characterizing the instant action as arising out of a transaction separate from that giving rise to the first action. In particular, Porn maintains that the bad-faith action stems from National Grange's conduct in handling his insurance claim, whereas the contract action stems from the circumstances surrounding the car accident. Porn's definition of the two transactions out of which the claims arise, however, is artificially narrow. For instance, the contract claim arises out of more than the car accident alone. It arises out of the accident in conjunction with National Grange's refusal to pay under the policy. Indeed, without the refusal to pay, no contract breach could exist. Similarly, the factual basis of Porn's bad-faith claim cannot be limited to National Grange's conduct in handling Porn's insurance claim. In this case, the facts of the car accident are also probative of National Grange's reasonableness in refusing to pay Porn's claim.

*Id.* at 35.

Responding to Porn's argument that the two claims did not form a convenient trial unit, *see* Restatement (Second) § 24 cmt. *b*, at 199, the First Circuit explained,

> Rather than addressing the degree to which the evidence supporting each claim overlaps, Porn challenges the convenience of bringing the claims together on two other grounds. First, Porn argues that evidence relevant to the bad-faith claim, specifically evidence of the amount of insurance available and the fact of settlement offers and negotiations, would prejudice the insurer's defense of the contract claim, and therefore the two claims do not form a convenient trial unit. However, we agree with the district court that any potential prejudice could be resolved by bifurcating the trial. With bifurcation, the evidence common to both claims, which was considerable, could have been presented at once and not "in separate lawsuits commenced at a distance of months or years."

*Id.* at 36 (quoting *Porn v. Nat'l Grange Mut. Ins. Co.*, No. 95–140–P–H, 1995 WL 626374, at *3 (D. Me. Sept. 27, 1995)). The court reiterated this point later in its opinion, emphasizing that the trial court likely would have tried the contract phase first and then the bad-faith phase before the same jury, thereby permitting Porn to argue "to the jury that National Grange's refusal to settle the contract action despite insufficient evidence of a meritorious defense was more evidence of its bad faith." *Id.* at 38. "[I]n a bifurcated trial such as the district court envisioned, . . . the jury would first be asked to determine the breach of contract claim. Only if the insured prevailed on that claim would the second (bad-faith) phase of the trial transpire." *Id.* at 37 n.6.

Additionally, the court observed that when Porn brought his contract suit, he "knew the facts necessary for bringing a bad-faith claim," even if he did not know of National Grange's "litigation conduct," an additional indicator of its bad faith. *Id.* at 37–38.

Even courts applying other claim preclusion principles have usually concluded that the subsequent bad-faith action is barred when it is based on conduct that preceded the first action. *See Reid v. Transp. Ins. Co.*, 502 F. App'x 157, 159–60 (3d Cir. 2012) (holding New Jersey's entire controversy doctrine (ECD) barred bad-faith claim that was brought after successful litigation for breach of contract and explaining, "Because Reid should have been aware of his bad faith claim, and the claim could have been asserted in his initial litigation, the District Court was correct to apply the ECD and bar Reid's claim"); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528–30 (6th Cir. 2006) (holding that res judicata barred bad-faith claims based upon conduct that occurred before plaintiff filed her complaint in the first lawsuit but not events that occurred afterward); *Zweber v. State Farm Mut. Auto. Ins. Co.*, 39 F. Supp. 3d 1161, 1164, 1169 (W.D. Wash. 2014) (holding Washington res judicata law precluded a bad-faith lawsuit following a successful lawsuit for recovery of UIM benefits); *Chandler v. Commercial Union Ins. Co.*, 467 So. 2d 244, 245, 251 (Ala. 1985) (upholding summary judgment based on res judicata when the plaintiff filed a bad-faith suit after prevailing in an earlier action for recovery of insurance benefits for the loss of his truck in a fire); *Lincoln Prop. Co., N.C. v. Travelers Indem. Co.*, 41 Cal. Rptr. 3d 39, 45, 48 (Ct. App. 2006) (holding that "the claim for breach of the covenant of good faith and fair dealing is part of the same primary right asserted in Lincoln's prior action for breach of the duty to defend" and is barred by res judicata); *Stone v. Beneficial Standard Life Ins. Co.*, 542 P.2d 892, 893–94 (Or. 1975) (en banc) (finding that a bad-faith action alleging that the insurer had refused to pay life insurance proceeds after falsely claiming it had performed a "thorough investigation" into the death when it in fact had performed no

investigation was barred under Oregon res judicata principles because it could have been brought with the original breach-of-contract action).

**C. Two Exceptions to This Approach: (1) When the Bad-Faith Case Is Based on Conduct that Occurred During the Prior Lawsuit; (2) Jurisdictions Where the Bad-Faith Claim Accrues Only After the Insured Prevails on the Underlying Claim for Policy Benefits.** Neither the court of appeals nor the plaintiffs have cited any cases where a first-party bad-faith case proceeded beyond summary judgment when it was based on the lack of an objective basis for claim denial and was filed *after* the insured had obtained a judgment for policy benefits. Based on our research, when the later bad-faith case has been allowed to go forward, this has occurred because of special facts in the case—or a special legal rule in the jurisdiction governing bad-faith claims. An example of the former is *McCarty v. First of Georgia Insurance Co.*, 713 F.2d 609 (10th Cir. 1983). There, the plaintiffs' home was destroyed by fire, and they sought benefits from their homeowners insurer. *Id.* at 611. The insurer denied the plaintiffs' insurance claim, asserting it had never issued a policy. *Id.* After a lengthy investigation, the Oklahoma Insurance Commission decided it had no jurisdiction. *Id.* At this point, the plaintiffs sued for benefits on the policy, but the insurer obtained dismissal of this suit based on the statute of limitations. *Id.* Ultimately, after the insurer produced an actual copy of the insurance policy and records indicating it had issued and approved the policy, the plaintiffs sued the insurer for bad faith. *Id.*

The Tenth Circuit held the bad-faith claim was not barred by claim preclusion because the plaintiffs had "pleaded sufficient facts to support their theory that the company's wrongful concealment prevented them from asserting their tort claim in the first action." *Id.* at 613. "The tort

claim . . . arose only after conclusion of the first action" when the plaintiffs obtained a copy of a policy and realized the insurer had been deceiving them. *Id.* The court noted that under Oklahoma law, "where plaintiff's omission of an item of his cause of action was brought about by defendant's fraud, deception, or wrongful conduct, the former judgment has been held not to be a bar to suit." *Id.* at 612–13 (quoting *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977)).

Likewise, in *Robinson v. MFA Mutual Insurance Co.*, the Eighth Circuit reversed the dismissal of a bad-faith action for failure to state a claim where the claim was based on deceit that was not uncovered until the trial of the prior action. 629 F.2d 497, 501–02 (8th Cir. 1980). Nevertheless, the court also noted, "Our holding on the res judicata issue does not foreclose [the insurer] from raising the issue at a later stage in these proceedings." *Id.* at 502 n. 6.

Another example of a case where the insured was not precluded from bringing a later first-party bad-faith lawsuit based on the insurer's fraudulent conduct in the earlier proceeding is *Corral v. State Farm Mutual Automobile Insurance Co.*, 155 Cal. Rptr. 342, 344–47 (Ct. App. 1979). In this case—decided prior to publication of the Restatement (Second)—the court found that claim preclusion was inapplicable to a bad-faith action derived from the insurer's misrepresentations in the prior proceeding that the tortfeasor was not uninsured. *Id.*

We now turn to the second category of exceptions to the general rule. The Florida Supreme Court has long held that a cause of action for first-party bad faith (which is statutory in Florida) *does not accrue* until the conclusion of the underlying breach-of-contract case for policy benefits. *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991). This means, of course, that there can be no claim

preclusion bar based on the prior adjudication. As explained by the Florida Supreme Court, bringing a first-party bad-faith claim in Florida is

> premature until there is a determination of liability and extent of damages owed on the first-party insurance contract. This avoids the problem *Blanchard* dealt with, which was the splitting of causes of action. However, a claim brought prematurely is not subject to a summary judgment. Such a claim should be dismissed as premature.

*Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1276 (Fla. 2000); *see Porn*, 93 F.3d at 36 (distinguishing Florida law); *see also Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006) ("We hold that the arbitration panel's award does not bar Dadeland's bad faith claim against St. Paul and actually it was a condition precedent to this statutory cause of action."). So in Florida, dismissal of a bad-faith claim is routine when the claim is brought before the predicate claim for policy benefits has been resolved. *See, e.g., Bele v. 21st Century Centennial Ins. Co.*, ___ F. Supp. 3d ___, ___, No. 6:15–cv–526–Orl–40GJK, 2015 WL 5155214, at *2 (M.D. Fla. Sept. 1, 2015).[4]

Iowa does not follow the Florida rule that entry of a judgment for policy benefits is a condition precedent to bringing a first-party bad-faith action. *See Handley v. Farm Bureau Mut. Ins. Co.*, 467 N.W.2d 247, 249

---

[4]Naturally, federal cases applying Florida res judicata law follow the Florida approach. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1271–72 (11th Cir. 2007) (applying Florida law and holding that a bad-faith claim was not barred because the plaintiff "could not have possibly asserted" it in the prior proceeding since it did not accrue until the plaintiff established an entitlement to payment on its contract claim).

Similarly, in West Virginia, "in order for a policyholder to bring a common law bad faith claim against his insurer . . . the policyholder must first substantially prevail against his insurer on the underlying contract action." *Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 513 S.E.2d 692, 711 (W. Va. 1998). In addition, West Virginia does not follow the Restatement's transactional approach to claim preclusion. *Slider v. State Farm Mut. Auto. Ins. Co.*, 557 S.E.2d 883, 888 (W. Va. 2001).

(Iowa 1991) (indicating the plaintiff's bad-faith claim was "not premature"). Nonetheless, we need to address the argument that the approach used in other jurisdictions like Alabama, Colorado, Connecticut, Missouri, New Jersey, Oregon, Washington, and Wisconsin would be inefficient. As seen above, all of those jurisdictions—and others—require the bad-faith claim to be joined with the breach-of-contract claim whenever it could have been brought at that time.[5]

**D. Simultaneous Discovery and Bifurcated Trials.** We previously held in a UIM case, where the insured was seeking both policy benefits and damages for bad faith, that it was an abuse of discretion to stay discovery of the insurer's files to the extent relevant to the insured's bad-faith case "until plaintiffs have established a prima facie case of bad faith." *Id.* at 250. Among other things, we noted that "plaintiffs ha[d] a present right to prepare all aspects of their case for trial." *Id.* We have never previously held that it is necessary to stay discovery on a first-party bad-faith claim until the breach-of-contract claim is resolved.

Like other jurisdictions, we have also held in the past that claim files are discoverable in first-party bad-faith insurance litigation. *See*

---

[5]Although they may have been mentioned in treatises, we do not think it is necessary to discuss claim preclusion cases that involve very different circumstances, such as the question whether a declaratory judgment bars a bad-faith action against a bank (not an insurer) for failure to pay under letter of credit. *See Schmueser v. Burkburnett Bank*, 937 F.2d 1025, 1031 (5th Cir. 1991) (applying Texas law).

Likewise, we do not think it is necessary to discuss old Louisiana law that has been superseded by statute. In *Cantrelle Fence & Supply Co. v. Allstate Insurance Co.*, 515 So. 2d 1074, 1078–79 (La. 1987), the Louisiana Supreme Court applied the Code Napoleon to find that common law res judicata principles were inapplicable and therefore a separate statutory bad-faith claim could be pursued after a judgment had been obtained for insurance benefits. However, this aspect of the Code Napoleon subsequently met its Waterloo in the Louisiana legislature, and now it appears statutory bad-faith claims generally must be brought in the original action. *See, e.g., Wood v. May*, 658 So. 2d 8, 9 (La. Ct. App. 1995), *reversed on other grounds*, 663 So. 2d 739 (La. 1995).

*Miller v. Continental Ins. Co.*, 392 N.W.2d 500, 506 (Iowa 1986); *Amsden v. Grinnell Mut. Reins. Co.*, 203 N.W.2d 252, 256 (Iowa 1972).

In *Squealer Feeds v. Pickering*, we qualified our prior caselaw somewhat and indicated that the insured could not obtain the contents of claim files prepared after the insured's claim was denied, absent a showing of substantial need and undue hardship. 530 N.W.2d 678, 688 (Iowa 1995), *abrogated by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 48 (Iowa 2004). The insured in that case conceded that any materials in the claim file postdating the denial of coverage were prepared in anticipation of litigation and thus constituted work product. *Id.* at 687.

However, in *Wells Dairy*, we then overruled prior cases, including *Squealer Feeds*, to the extent they adopted something *other than* the following test for work product—"whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." 690 N.W.2d at 48 (quoting 8 Charles Alan Wright et al., *Federal Practice and Procedure* § 2024, at 198–99 (2d ed. 1994)). This means that claim files are not covered by the work product doctrine except insofar as they contain documents that would not have been prepared but for anticipated litigation. *See* Dennis J. Wall, *Litigation and Prevention of Insurer Bad Faith* § 12:5 (3rd ed. 2011) ("Where the insured's complaint states a cause of action for first-party bad faith, the claims adjuster's files can generally be discovered. Work product objections will lie in particular cases.").

Also, we have repeatedly held that one essential element of a first-party bad-faith claim is that the insurer lacked an objectively reasonable basis for denying the claim. *See, e.g., Wilson v. Farm Bureau Mut. Ins.*

*Co.*, 714 N.W.2d 250, 262–63 (Iowa 2006) (discussing and applying this element); *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) (explaining the "[o]bjective element: lack of reasonable basis"); *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149 (Iowa 1998) ("To be successful in a first-party bad-faith claim, a plaintiff must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without reasonable basis."); *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 96 (Iowa 1995) ("The absence of a reasonable basis for denying the claim is an objective element. . . . Where an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law."), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000). As we put it in *Morgan,* "Iowa law is clear that an imperfect investigation, standing alone, 'is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.' " 534 N.W.2d at 98 (quoting *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d at 250, 254–55 (Iowa 1991)).

Based on the foregoing, during the pretrial stages of a first-party case like this one, we see no difficulty in combining the breach-of-contract and bad-faith claims. The plaintiffs can conduct discovery on both claims, but the defendant can move for summary judgment if it had an objective basis for denying the claim, regardless of what its internal files may show on its subjective intent.

The question then becomes whether problems would arise at trial. *See* Restatement (Second) § 24 cmt. *b*, at 199 (noting that one consideration is whether the claims "form a convenient unit for trial purposes"). It is true that much of the evidence in an insurer's files

might be irrelevant to the breach-of-contract case, as well as unfairly prejudicial to the insurer. However, as the *Porn* court observed, this can be solved by bifurcating the trial into two phases. *See* 93 F.3d at 36–38, 37 n.6; *see also Tannenbaum v. Fed. Ins. Co.,* 608 F. App'x 316, 318 (6th Cir. 2015) (pointing out that the district court divided the trial into "a breach-of-contract phase and a bad-faith phase"); *First United Pentecostal Church v. Guideone Specialty Mut. Ins. Co.*, 189 F. App'x 852, 854 (11th Cir. 2006) ("The trial was bifurcated into a liability phase for breach of contract and a bad faith phase."); *Agrawal v. Paul Revere Life Ins. Co.*, 182 F. Supp. 2d 788, 791 (N.D. Iowa 2001) (ordering bifurcation of trials and stating that "[i]f possible . . . the same jury will try the bad faith claim in the event that it resolves the coverage issue in the plaintiff's favor"); *Powell*, 922 A.2d at 1083 n.5 ("[A]ny potential prejudice resulting from facts that are not related could be resolved by bifurcating the trial.").

A bifurcated trial actually offers efficiency *gains*, as contrasted with a procedure under which the bad-faith claim would not even be *filed* until the breach-of-contract claim has been adjudicated. As the Colorado Court of Appeals observed in *Salazar,* "trial courts may choose to bifurcate the trials, allowing the evidence, common to both claims, to be presented at once and not in separate lawsuits commenced months or years later." 148 P.3d at 282.

Our rules of civil procedure authorize bifurcated trials. *See* Iowa R. Civ. P. 1.914 ("In any action the court may, for convenience or to avoid prejudice, order a separate trial of any claim, counterclaim, cross-claim, cross-petition, or of any separate issue, or any number of any of them."). In *Johnson v. State Farm Automobile Insurance Co.*, the court of appeals approved the use of this rule to bifurcate the trial of an insured's claim

for UIM benefits against her insurer from the trial of her bad-faith claim against the same insurer. 504 N.W.2d 135, 137 (Iowa Ct. App. 1993). Notably, rule 1.914's wording is similar to that of Federal Rule of Civil Procedure 42(b), under which a number of the foregoing federal cases were decided.

**E. Final Observations.** For all these reasons, we join the other jurisdictions that follow the Restatement (Second) and hold a first-party bad-faith claim based on denial of insurance benefits without a reasonable basis ordinarily arises out of the same transaction as a breach-of-contract claim for denial of those same benefits. This means a final judgment in the breach-of-contract case would bar the bringing of a subsequent, separate bad-faith lawsuit. As in other jurisdictions, the potential prejudice from introducing evidence relevant only to the insurer's bad faith can be resolved by bifurcating the trial into a breach-of-contract phase and a bad-faith phase.

While a first-party bad-faith claim will always require some *additional* proof, such a claim nonetheless challenges the same basic conduct as the underlying breach-of-contract claim—namely, the insurer's refusal to pay benefits that were rightly owed. Perfect identity of evidence is not the standard in Iowa for whether claim preclusion applies. To the contrary, the Restatement makes clear that "a substantial overlap" of proofs and witnesses "ordinarily" leads to claim preclusion, and even the absence of such overlap is not fatal to claim preclusion. *See* Restatement (Second) § 24 cmt. *b*, at 199; *see also id.* § 25, at 209 ("The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action . . . [t]o present evidence or grounds or theories of the case not presented in the first action . . . .").

Obviously, in *Pavone*, the claim relating to the second casino involved different evidence to some extent. *See* 807 N.W.2d at 838. Similarly, in *Arnevik v. University of Minnesota Board of Regents*, we found that a second lawsuit for indemnification was barred by claim preclusion even though the basis for indemnification in the second suit was entirely different—that is, a breach of the employment contract rather than respondeat superior. 642 N.W.2d 315, 318–21 (Iowa 2002). We specifically rejected the plaintiff's assertion that claim preclusion did not apply because "different facts were necessary to prove the respondeat superior claim than were necessary to prove [the] theory in contract." *Id.* at 321.[6]

Of course, there are limits to our holding. As we observed in *Leuchtenmacher*, when the bad-faith claim is based on conduct that occurred after the breach-of-contract case was filed, that is a different kettle of fish. 460 N.W.2d at 861. That is not the case here. Here the plaintiffs "could have raised" the bad-faith claim in the contract action. *See Arnevik*, 642 N.W.2d at 319; *see also Pavone*, 807 N.W.2d at 838 (noting the Clinton action "could have been fully and fairly adjudicated in the original Emmetsburg action"). At oral argument before our court,

---

[6]The court of appeals analogized the separate lawsuits here to the separate lawsuits that were involved in *Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418 (Iowa 1996). We think the analogy is off the mark. Iowa Coal was a mining company that wanted to use certain strip mining sites as sanitary landfills. *Id.* at 424–25. In the first action, it challenged a county ordinance as having been improperly enacted and effecting a regulatory taking of its property. *Id.* at 425. In the second action, it alleged that the county had tortiously interfered with a proposed contract with a private waste company and that it had a prior nonconforming use for landfill purposes. *Id.* at 434–36, 438–40. The thrust of the two lawsuits was entirely different. The tortious-interference claim in the second lawsuit was based on the county's overt campaign to block the deal with the waste company; the nonconforming-use claim assumed the ordinance was valid and focused on whether Iowa Coal had a prior landfilling use that it had not discontinued. *Id.* at 443–45.

plaintiffs' counsel conceded a bad-faith claim could have been filed in March 2008 as part of the action seeking recovery for policy benefits. At that point, plaintiffs were well aware their insurance claim had been pending for nearly a year, but United Fire had only paid $108,310 toward the building despite the appraisal commissioned by plaintiffs showing its value to be $388,200. The plaintiffs also knew that *even United Fire conceded* Martinez had purchased the long-vacant building and land for $150,000 and then put substantial improvements costing at least $45,000 into it before opening their Mexican restaurant. The plaintiffs also knew United Fire had paid nothing for various costly items of personal property including three stove hoods (ranging from eighteen feet to twenty-four feet long) and three walk-in coolers.

The plaintiffs also believed at that time that United Fire had ignored their "continuing deteriorating situation and pleas for relief"; that they had "become impoverished" while the insurer engaged in "intentional delays" and "flagrant disregard" for the customer; that United Fire had "intentionally delayed the negotiations in settlement of [their] claim"; and that United Fire was not treating "their insured fairly," and trying to find ways to deny money "long overdue." Indeed, plaintiffs' attorney had twice specifically accused United Fire of "bad faith."

Undoubtedly, further evidence relevant to the plaintiffs' bad-faith claim surfaced during discovery in the second action. That, of course, is the point of discovery. For the reasons already stated, we generally believe this evidence would have come to light earlier if the two claims had been combined in the original action. It would be difficult to argue that the splitting of the two claims here advanced the purposes of "judicial economy and efficiency." *See Penn v. Iowa State Bd. of Regents*, 577 N.W.2d 393, 398 (Iowa 1998) (characterizing these purposes as goals

of claim preclusion). More than seven years after the first action was filed by insured against insurer, the parties' disputes are still not resolved. Bringing the first-party bad-faith claim in the original action would be far more efficient—and we believe principles of claim preclusion require this. If necessary, the trial can be bifurcated into two phases.

Again, a different case might well be presented if the bad-faith claim could not have been asserted in the original case, but that is not the situation here. The plaintiffs had a basis for alleging bad faith in March 2008, when they filed their original suit, as well as ample time thereafter to amend that suit to add a bad-faith claim.

Lastly, we address the plaintiffs' contention that application of the customary rules of claim preclusion here will lead to the routine inclusion of bad-faith counts in suits for insurance recoveries. We think not. For one thing, all counsel are bound by Iowa Rule of Civil Procedure 1.413(1). By signing a petition alleging bad-faith refusal to pay insurance benefits *or* an answer denying that insurance benefits are owed, counsel certifies that "to the best of counsel's knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact . . ." Iowa R. Civ. P. 1.413(1). Moreover, as we discussed earlier, one element of first-party bad faith is that the denial of the claim lacked an objectively reasonable basis. Counsel should be able to make a preliminary assessment on this point before an action is filed against the insurer or if need be, soon thereafter. Finally, as we have pointed out, our decision today is not a lone ranger: Many other jurisdictions treat the breach-of-contract claim and the bad-faith claim as flowing from one transaction for claim preclusion purposes. We see no indication that this approach has led to practical difficulties in those

other jurisdictions, such as an unwarranted proliferation of bad-faith claims.

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the district court's grant of summary judgment to United Fire.[7]

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Wiggins, J., files a dissenting opinion in which Hecht, J., joins. Appel, J., files a separate dissenting opinion in which Wiggins and Hecht, JJ., join.

---

[7]As alternative grounds for affirmance of the district court (in whole or in part), United Fire urges that Villarreal and Martinez were not proper parties to the bad-faith action and that plaintiffs were not entitled to relief from the January 1, 2014 rule 1.944 dismissal. Because of our disposition of this appeal, we need not reach either argument.

#14–0298, *Villarreal v. United Fire & Cas. Co.*

**WIGGINS, Justice (dissenting).**

I do not agree with the majority's analysis; therefore, I join the dissent. However, I write to stress that under the majority decision, district courts should not limit discovery when a party joins a bad-faith claim with his or her underlying tort or contract claim. Additionally, although a court may require the jury to decide the underlying tort or contract claim prior to having it hear further evidence and decide the bad-faith claim, the trial should not be bifurcated when both claims are brought in the same action. Rather, the district court should allow discovery to proceed on both claims and try both claims in the same trial.

The majority's primary rationale for deciding the case the way it does is judicial economy. Because a bad-faith claim and the underlying tort or contract claim typically involve the same facts, the majority sees no reason not to require the district court to try them together. However, if our district courts do not allow discovery to proceed on both claims at the same time or bifurcate actions in which both claims are brought, attorneys will try each claim separately the same way they did before the majority changed the law in this case. In other words, if district courts continue to allow separate discovery and to bifurcate actions involving both bad-faith and related tort or contract claims, the change in the law the majority seeks to accomplish in its opinion would not amount to much of a change at all.

Hecht, J., joins this dissent.

**APPEL, Justice (dissenting).**

I respectfully dissent. As will be seen below, I view the case differently than the majority. I would reverse the decision of the district court and allow the insured's bad-faith claim to proceed to trial.

## I. Background Facts and Proceedings.

The majority's overview of the facts and proceedings does not present the entire picture. After the insurance company paid $108,310 on the claim but refused to pay more, the insured filed a breach-of-contract action. The factual questions in the breach-of-contract action were simple: what was the value of the insured's property destroyed by fire and did the value exceed the amount that the insurance company had previously paid? A jury answered the question in the affirmative and awarded the insured a verdict of $236,901.52.

At trial for the contract claim, the insurance adjuster responsible for the insured's claim testified she had no idea what the actual value of the property was. This is extraordinary trial testimony: an adjuster acting on behalf of the insurer, who had the responsibility to evaluate and fairly pay claims, had no idea what the value of the destroyed property was. This was powerful evidence that could be marshalled in support of a bad-faith claim.

After obtaining a verdict in the first trial, the insured then filed its bad-faith claim. Extensive discovery followed, including discovery of the insurer's claims file and deposition of the insurer's claims attorney and the insurer's claims supervisor. The contested factual issues in the bad-faith case were materially different from the underlying contract action. In the bad-faith action, the contested factual issues focused on the manner in which the insurer handled the insured's claim.

Given the different nature of the factual issues in the bad-faith action, the potential scope of discovery was different, and certainly much broader, than in the contract action in which the only contested factual issues related to the value of the destroyed property. The insured took advantage of the broader discovery opportunity, deposing the lawyer who represented the insurance company in the original breach-of-contract action and obtaining through extensive discovery claim files and various correspondences between the insurance company and its counsel. *Compare Handley v. Farm Bureau Mut. Ins. Co.*, 467 N.W.2d 247, 250 (Iowa 1991) (holding discovery of insurance claim file allowed in bad-faith action), *with Johnson v. State Farm Auto. Ins. Co.,* 504 N.W.2d 135, 137 (Iowa Ct. App. 1993) (noting investigation file was not subject to discovery in uninsured portion of suit which had been severed from bad-faith claim).

After discovery, the insured developed a bad-faith case supported by substantial evidence. The plaintiffs produced substantial evidence to show that the claims adjuster on the file knew that the value of the claim was in excess of what the insurer had paid but nonetheless repeatedly refused to approve additional payments and that, although the hiring of an appraiser was authorized to value the property destroyed, none was ever hired.

The insurer moved for summary judgment. The district court granted the motion on the ground that the insured was precluded by principles of res judicata because of the insured's failure to bring the claim in the original action. The insured appealed. We transferred the case to the court of appeals. A majority of the court of appeals found that under applicable Iowa law, the insured was not precluded from bringing a separate bad-faith claim. We granted further review.

**II. Discussion.**

**A. Overview of Iowa Law.**

1. *Introduction.* The proper scope of the doctrine of res judicata has been a traditional source of controversy in American law. At the risk of oversimplification, the dispute has centered on broad or narrow application of the doctrine. *See* Edward W. Clearly, *Res Judicata Reexamined,* 57 Yale L.J. 339, 339–42 (1948) (discussing the differences between the traditional narrower view and the broader transactional approach). The general question in the debate is how broadly a "claim" or "cause of action" should be defined. *Id.* at 340–41.

As a general matter, the law has shown an ambivalence toward the doctrine. As noted by the leading historic advocate of the broad transactional approach to res judicata, Judge Clarke, in a dissenting opinion before the adoption of the Restatement (Second) of Judgments, "The defense of res judicata is universally respected, but actually not very well liked." *Riordan v. Ferguson,* 147 F.2d 983, 988 (2d Cir. 1945) (Clarke, J., dissenting).

We have historically adopted a fairly narrow view of the doctrine of res judicata. As is illustrated in the majority opinion of the court of appeals, there are several Iowa precedents that have a bearing on the res judicata issue presented in this case. The majority opinion of the court of appeals well plowed much of the legal ground, but there are several points worth emphasis. First, there is a clear difference between what must be proven to support a claim of breach of contract and a bad-faith claim. Second, our caselaw has emphasized the difference between an identical or "same claim," a "related claim," and a claim that is not based upon "the same evidence."

2. *Difference between breach-of-contract and first-party bad-faith claim.* This case involves a first-party insurance bad-faith claim. A first-party claim involves an insured's attempt to recover against his or her own insurance company. First-party claims were first recognized in *Gruenberg v. Aetna Insurance Co.*, when the California Supreme Court emphasized that the duty of good faith is independent of the insured's contractual obligation. 510 P.2d 1032, 1040 (Cal. 1973) (en banc). The *Gruenberg* court also held that a first-party bad-faith plaintiff may recover for emotional distress without a showing of extreme and outrageous conduct ordinarily associated with the common law tort of intentional infliction of emotional distress. *Id.* at 1041. Because the relationship between the insured and the insurer implicated the public interest, the California Supreme Court has held that punitive damages would be available in bad-faith tort situations. *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 146 (Cal. 1979) (en banc).

We first recognized such a claim in *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790, 794 (Iowa 1988). We noted the rationale in *Gruenberg* and other cases for the bad-faith tort: that arbitrary coverage denial and delay of payment must be addressed, that physical injury and economic loss may occur when bargaining with the insurance company, and that the relationship between an insurer and insured is imbued with the public interest. *Id.* at 791–92 (citing Mary Elizabeth Phelan, *The First Party Dilemma: Bad Faith or Bad Business?*, 34 Drake L. Rev. 1031, 1035–36 (1985)); *see also id.* at 791 n.1. We specifically noted that traditional contract remedies would not compensate an insured for the harms arising from bad-faith conduct and that the unequal bargaining power between the insured—who has sustained a loss and sought coverage—and the insurer requires redress. *Id.* at 794.

As this case well illustrates, there are important differences between a breach-of-contract claim and a first-party bad-faith claim. A breach-of-contract claim is based upon the contractual terms and enforces the expectations of the parties. *See Magnussen Agency v. Pub. Entity Nat'l Co.–Midwest,* 560 N.W.2d 20, 25, 27 (Iowa 1997). In this case, the breach-of-contract claim involved a contest over the value of the destroyed property.

But a bad-faith claim is a different animal. Bad faith involves "the knowing failure to exercise an honest and informed judgment." *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990) (quoting *Anderson v. Cont'l Ins. Co.,* 271 N.W.2d 368, 377 (Wis. 1978)). As is apparent, "[t]he fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim." *Bellville v. Farm Bureau Mut. Ins. Co.,* 702 N.W.2d 468, 473 (Iowa 2005). The factual basis and the evidence required to support a first-party bad-faith claim is thus materially different from the evidence required to support a breach-of-contract claim.

Because of the factual differences in the claims, discovery is also different. In a contract claim, discovery is limited to the factual questions related to the question of breach of contract. On the other hand, in a bad-faith claim, broader discovery, including discovery of the claim file, is allowed. A bad-faith claim can also give rise to difficult discovery disputes regarding the scope of attorney–client and work-product privileges. *See generally Handley,* 467 N.W.2d at 250; *Johnson,* 504 N.W.2d at 137.

Not only do the factual requirements of a bad-faith claim differ from a breach-of-contract claim, the remedies are different too. The breach-of-contract claim entitles a plaintiff to recover the benefit-of-the-

bargain damages. A bad-faith claim, however, is a tort. Among other things, compensatory, emotional distress, and punitive damages are available against the insurance company. *Dolan*, 431 N.W.2d at 794.

The factual requirements and available remedies are different because the claims protect different interests. A contract claim protects the insured's economic interests. *See Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 650–51 (Iowa Ct. App. 1996). The tort of bad faith protects the dignity and emotional interests of the insured and fosters the public policy of not allowing insurers to use their superior position to the disadvantage of their insureds. *See Egan*, 620 P.2d at 146; *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273 (Colo. 1985) (en banc); *Grand Sheet Metal Prods. Co. v. Protection Mut. Ins. Co.*, 375 A.2d 428, 430 (Conn. Super. Ct. 1977).

Experienced plaintiffs and defense counsel recognize that the stakes in a potential bad-faith claim are typically much higher than in an ordinary contract action. Contract claims arise in the ordinary course of the insurance business and are often defended on a win-some/lose-some, cost-of-doing business basis. Bad-faith claims, however, put at risk a dramatically greater financial and reputational interest of the insurer and its employees. As a result, bad-faith claims often give rise to a much more vigorous, resource-intensive defense than an ordinary contract action, often involving the retention of experienced outside counsel to defend the bad-faith action. As observed by one leading commentator, high stakes bad-faith disputes "tend to bring out the participants' meaner sides." Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 10:1 (2d ed. 1997) [hereinafter Ashley].

3. *"Same-claim" and "same-evidence" criteria distinguish identical claims from related claims.* We have considered in our caselaw the

difference between an identical claim and a related claim. Our cases indicate that an "identical claim" must be brought in the first action and will be barred by the doctrine of res judicata if it is not joined with the original action. When a "related claim" is involved, however, the plaintiff has the option of bringing the claim in the original proceeding or bringing a separate action on the related claim.

A key issue in our caselaw is distinguishing between an identical claim and a related claim. As will be seen below, our cases tend to emphasize that the claims must utilize the "same evidence" and involve the "same claim" in order to be considered "identical." By distinguishing between identical claims and related claims, and by basing the distinction at least in part on a "same-claim" and a "same-evidence" test, our law tends to depart from the broad transactional approach to res judicata often employed in federal caselaw. The distinction between the same-evidence approach and the transactional test has been recognized by a leading commentator. *See* Robert Kelly, *Post-Trial Issues in* 12 *New Appleman on Insurance Law Library Edition* § 156.09[1][a], at 156–51 (Jeffrey E. Thomas, Laura A. Foggan, & Lorelie S. Masters eds., 2015).

We begin our discussion of Iowa law with *B & B Asphalt Co. v. T. S. McShane Co.*, 242 N.W.2d 279 (Iowa 1976). In this case, the plaintiff first filed a fraud action against the defendant. *Id.* at 281. After failing in the first action, the plaintiff brought a second action based upon the same facts alleging breach of express and implied warranties and negligence. *Id.* We held the second action was barred by res judicata. *Id.* at 287. We noted, "Our cases say identity of cause of action is established when the *same evidence* will maintain both actions." *Id.* (emphasis added). The same-evidence approach in *B & B Asphalt* was firmly rooted in

existing Iowa caselaw. *See Young v. O'Keefe*, 248 Iowa 751, 756, 82 N.W.2d 111, 114 (1957) (noting the test is "to inquire if the same evidence will maintain both the present and the former action" (quoting *Band v. Reinke*, 230 Iowa 515, 520, 298 N.W. 865, 868 (1941))); *Woodward v. Jackson*, 85 Iowa 432, 435, 52 N.W. 358, 359 (1892). In *B & B Asphalt*, we applied our traditional same-evidence principle in the *O'Keefe/Band/Woodward* line of cases and held that the same evidence supported both the first and second actions, and as a result, Iowa principles of res judicata barred the second claim. 242 N.W.2d at 287.

Another case illustrating important Iowa principles of res judicata is *Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398 (Iowa 1982). In this case, the central issue was the interesting question of whether a party may bring separate actions claiming breach of different provisions of a single lease. *Id.* at 401. Citing *B & B Asphalt* with approval, we stated that in determining whether a separate action was present, we consider "the protected right, the alleged wrong, and the relevant evidence." *Id.* (citing *B & B Asphalt*, 242 N.W.2d at 286). Under the facts presented in the case, we held that res judicata did not apply. *Id.* We noted that the alleged right, the alleged wrong, and the relevant evidence were different from claims in an earlier action involving the same contract. *Id.* We further emphasized, however, that the mere fact a plaintiff *could* have brought the claims in one action did not bar the bringing of successive actions. *Id.* at 401–02.

Another case closer to the subject matter of this case is *Leuchtenmacher v. Farm Bureau Mutual Insurance Co.*, 460 N.W.2d 858 (Iowa 1990). There, the insured estate sought to bring a bad-faith claim against an insurer after a prior successful action on an uninsured motorist policy. *Id.* at 859. We cited favorably *B & B Asphalt* and noted

that the question was whether the first and second causes of action amounted to the "same claim." *Id.* at 860. We noted that "a second claim is likely to be considered precluded if the acts complained of, and the recovery demanded, are the same." *Id.* (citing *B & B Asphalt Co.*, 242 N.W.2d at 286). While we did not depart from our same-evidence precedents, we recited the elastic phrases of the Restatement (Second) of Judgments, which state that in determining whether causes of action arose from the same transaction, the inquiry turns on whether there is "a natural grouping or common nucleus of operative facts" and involves "a determination whether the facts are so woven together as to constitute a single claim." *Id.* (quoting Restatement (Second) of Judgments § 24 cmt. *b* (1982) [hereinafter Restatement (Second)]).

In *Leutchtenmacher*, the insurer filed a motion to dismiss the claim, arguing that because the bad-faith action could have been brought in the first action, the claim was barred as a matter of law. *Id.* at 859. The *Leutchtenmacher* court declined to so rule. Instead, the court held that whether the claim was precluded "depends on whether the cases arose out of the same facts." *Id.* at 861. The *Leutchtenmacher* court gave an example: "In fact, a bad-faith claim might well be based on events subsequent to the filing of the suit on a policy and therefore could not be based on the 'same' facts." *Id.* We concluded, however, by emphasizing that whether the claims were precluded depended upon the general principle of whether they arose out of the "same facts." *Id.*

An additional illustrative Iowa case is *Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418 (Iowa 1996). The case involved a classic ongoing regulatory battle royal between an economically distressed Iowa Coal and Monroe County. *Id.* at 424–26. In the first action, Iowa Coal challenged the validity of a zoning ordinance that limited its operations

in the county on a number of constitutional grounds.  *Id.* at 425–26. Iowa Coal did not prevail.  *Id.*

Monroe County then passed a new but almost identical zoning ordinance.  *Id.* at 426.  Not to be outdone, Iowa Coal launched another action.  *Id.*  In the second action, Iowa Coal brought a claim for tortious interference in addition to renewing its constitutional claims made in the previous action.  *Id.*

In *Iowa Coal*, Monroe County argued that the tortious interference claim could have been brought in the original action and therefore was barred under res judicata.  *Id.* at 427.  We rejected the assertion.  We recognized that there was evidence in the first action from which the district court could have found intentional interference.  *Id.* at 443. Although there was some overlap of evidence, this was not determinative. *Id.* at 443–44.  We observed that evidence in support of the tortious interference claim was different from the evidence to support the constitutional claims in the first action.  *Id.* at 444.  Among other things, we noted that under the tortious interference claim, Iowa Coal "had to prove the County's motive in its interference was to financially injure or destroy Iowa Coal" while this showing was not required under the claims brought in the original action.  *Id.*  We further noted that the fact the tortious interference claim might have been litigated in the original action was of no consequence.  *Id.*

Finally, in *Arnevik v. University of Minnesota Board of Regents*, we reprised the contours of Iowa res judicata principles.  642 N.W.2d 315 (Iowa 2002).  Among other things, we noted that claim preclusion is likely "where the 'acts complained of, and the recovery demanded are the *same* or where the *same evidence* will support both actions.' "  *Id.* at 319 (emphasis added) (quoting *Whalen v. Connelly*, 621 N.W.2d 681, 685

(Iowa 2000)). Additionally, we have noted that the first and second action must be functionally the same but for the creative stylings of counsel. *See Pavone v. Kirke,* 807 N.W.2d 828, 837 (Iowa 2011) (noting that we "carefully distinguish" between the same cause of action and related causes of action); *Whalen,* 621 N.W.2d at 685. The above solid and unwavering line of authority was relied upon by the court of appeals in holding that the bad-faith claim in this case did not need to be joined with the original contract claim.[8]

**B. Application of Iowa Law.** In my view, application of the same-claim, same-evidence principles embraced in the above quintet of Iowa cases supports the position of the insured and does not allow application of res judicata in this case. Further, the mere fact the bad-faith claim could have been brought earlier clearly is not determinative. *See, e.g., Westway,* 314 N.W.2d at 401–02.

It seems clear to me that, as in *Iowa Coal,* the evidence in a bad-faith tort action is materially different from a contract action on the insurance policy. A breach of contract, of course, may be present without a valid bad-faith claim. *See Bellville,* 702 N.W.2d at 473. Evidence in the breach-of-contract claim in this case was quite narrow and focused entirely on the value of the destroyed property. And when the claim is so limited, discovery is correspondingly limited.

---

[8]My reading of *Leuchtenmacher* and *B & B Asphalt* is supported by *Huffey v. Lea,* 491 N.W.2d 518 (Iowa 1992). In *Huffey,* we considered whether a beneficiary could bring an action for tortious interference with a will after the beneficiary had previously litigated a will contest involving the same parties. *Id.* at 519–20. We concluded that claim preclusion did not bar the subsequent action, emphasizing the state of mind required to support a tortious-interference action which was absent from the will contest. *Id.* at 521–22. The majority opinion in this case essentially adopts the view espoused by the *Huffey* dissent. *See id.* at 523–27 (McGiverin, C.J., dissenting). Whether *Huffey* is good law after today is unclear.

The nature of the bad-faith claim in this case, however, reaches into the manner in which the claim was handled. The evidence to support the bad-faith claim is not the same as the evidence to support the breach-of-contract claim. A bad-faith claim can be proven only by showing exactly how the company processed the claim, how thoroughly the claim was considered, and why the company took the action it did. *See Brown v. Superior Ct.*, 670 P.2d 725, 734 (Ariz. 1983) (en banc). The subjective state of mind of claim handlers is critical. *See Kiner*, 463 N.W.2d at 12–13. Who at the insurance company knew what, when they knew it, and other factual questions totally foreign to the contract dispute are the guts of the bad-faith action. That is why our caselaw allows risk-management experts to testify in bad-faith cases about the proper risk management of a claim after the loss has occurred, an issue distinct from the question of whether the contract was breached in the first instance. *Nassen v. Nat'l States Ins. Co.*, 494 N.W.2d 231, 235–36 (Iowa 1992). As noted in one recent case, "Insurance bad faith cases are won or lost on the contents of the insurer's claims files." *State Farm Mut. Auto. Ins. Co. v. Howard*, 296 F.R.D. 692, 695 (S.D. Ga. 2013) (quoting Ashley at § 10:28). The claims file, however, generally has little to do with a breach-of-contract claim.

Thus, under the same-claim, same-evidence approach emphasized in *B & B Asphalt* and its progeny through *Arnevik*, res judicata does not apply. The evidence needed to support a bad-faith claim goes well beyond that which would ordinarily support a simple breach-of-contract claim. This case presents a classic example of the different nature of the contract and bad-faith causes of action. The contract action focused solely on property values. The bad-faith action will focus on the postloss

behavior of the insurance company in handling the claim, which was completely irrelevant in the first action.

Further, related but separate rights are involved in the two claims. The insurance company has a contractual duty to honor its contract, but it has a separate duty in tort to deal with its insured in good faith. The focus of the tort is not whether a specific contractual provision has been breached, but whether the insurer's "conduct [has damaged] the very protection or security which the insured sought to gain by buying insurance" through its handling of the claim. *Rawlings v. Apodaca*, 726 P.2d 565, 573 (Ariz. 1986) (en banc).

The remedies are also distinct. The recovery is not limited to the benefit of the bargain. Instead, remedies include consequential damages, emotional distress damages, and punitive damages. *Dolan*, 431 N.W.2d at 794. The harm compensated by an award of emotional distress damages is different from the economic harm protected in the contract claim and, of course, requires different proof. Further, punitive damages are available in part to support public policies inherent in the contract of insurance. The differences in remedies demonstrate that different rights and wrongs are being addressed in contract actions compared to bad-faith actions.

Nothing in *Leuchtenmacher* is to the contrary. *Leuchtenmacher* emphasized that a motion to dismiss did not lie when an insured who had successfully litigated a contract claim against the insurer brought a separate bad-faith action. 460 N.W.2d at 861. *Leuchtenmacher* emphasized the traditional themes of identity of claim and same evidence. *Id.* at 860. While *Leuchtenmacher* did state that "a bad-faith claim might well be based on events subsequent to the filing of the suit on a policy and therefore could not be based on the 'same' facts," such

language does not limit the situations in which a contract claim and a bad-faith claim are not "based on the same facts." *Id.* at 861. It only provides an obvious example of how the facts in a bad-faith claim might be different from a contract claim. *Id.*

The insurer also carries Restatement (Second), section 24 as a head on a pike in support of its claim. The Restatement emphasizes that its terms are "not capable of a mathematically precise definition" and notes that determining whether to apply res judicata requires a "delicate balance" between the rights of both the insurer and the insured. Restatement (Second), § 24 cmt. *b.* The language of this Restatement provision is elastic, and in any event, if it is to be applied, it must be read in a manner consistent with the woof and weave of Iowa same-claim, same-evidence caselaw. To the extent the Restatement is inconsistent with our prior caselaw, I would not follow it.

I acknowledge, of course, that there is authority from other jurisdictions that embraces a broad transactional theory of res judicata. The majority opinion has a fistful of them. Although they could be serially picked apart, a general observation will do. As a rule, the cases cited by the majority glide over any same-evidence or same-claim considerations in favor of a broader transactional approach. They also contain a whiff of hostility to first-party bad-faith claims by minimizing the differences between a bad-faith and a contract claim.

A good example of this gliding and minimizing with a whiff of hostility is *Porn v. National Grange Mutual Insurance Co.*, 93 F.3d 31 (1st Cir. 1996). Remarkably, *Porn* does not grasp the difference between an identical claim and a related claim emphasized in the Iowa cases. *See Iowa Coal*, 555 N.W.2d at 442 (citing in support *Westway*, 314 N.W.2d at 401, and *Leuchtenmacher*, 460 N.W.2d at 860). Further, *Porn* minimizes

the factual differences between a bad-faith and a contract claim, suggesting that the claims involve only "different shadings of the facts." *Porn*, 93 F.3d at 35. In this case, the differences in the claims do not involve "different shadings of the facts," but a materially different discovery, evidentiary, and remedial regime. In *Porn*, the court plays the res judicata symphony in the transactional key of B flat minor, while in our Iowa cases, the res judicata symphony is played in the same-evidence, same-claim key of A major. In short, they have some similarities but do not sound very much alike.

Although the majority suggests that a "great majority" of cases supports its view, a more objective observation is made by a leading commentator, who indicates that "[t]he courts are divided on the issue." Ashley at § 7:11. If we are enlisting cases to serve as penguins marching to the sea, there are conscripts that support the traditional Iowa position as well as the majority viewpoint. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1271–72 (11th Cir. 2007) (holding insured not barred from separate bad-faith action even though insured could have brought claim in earlier arbitration proceeding); *Schmueser v. Burkburnett Bank*, 937 F.2d 1025, 1031 (5th Cir. 1991) (noting that under Texas law, bad-faith claim against bank requires different proof than earlier action, seeks a different measure of recovery, and is thus not barred by prior declaratory action); *Corral v. State Farm Mut. Auto. Ins. Co.*, 155 Cal. Rptr. 342, 345 (Ct. App. 1979) (contrasting bad-faith claim with contract claim under auto insurance policy); *Cantrelle Fence & Supply Co. v. Allstate Ins. Co.*, 515 So. 2d 1074, 1079 (La. 1987), *superseded by statute*, Act of July 18, 1990, No. 521, §§ 1–2, 1990 La. Sess. Law Serv. 521, 521; *Slider v. State Farm Mut. Auto. Ins. Co.*, 557

S.E.2d 883, 890 (W. Va. 2001) (finding bad-faith claim not precluded by res judicata because different evidence required).

Further, decisions embracing a same-evidence approach to res judicata rather than a broad transactional test are well represented in the caselaw. *See, e.g., Butts v. Evangelical Lutheran Good Samaritan Soc.*, 852 F. Supp. 2d 1139, 1145 (D.S.D. 2012); *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1061 (M.D. Ala. 2006); *SMA Servs., Inc. v. Weaver*, 632 N.W.2d 770, 774 (Minn. Ct. App. 2001). *But see Motient Corp. v. Dondero*, 269 S.W.3d 78, 85 (Tex. Ct. App. 2008) (noting Fifth Circuit's transactional test does not consider variations in the evidence).

In any event, caselaw counted on an abacus does not provide a rule of decision or provide a basis for the obvious innovations of our prior caselaw presented in the court's opinion in this case. *See Handeland v. Brown*, 216 N.W.2d 574, 577 (Iowa 1974) ("[W]e have no obligation to adopt a rule just because it has generally been adopted elsewhere. Although cases from other states may be persuasive authority, they have no greater cogency than the reasoning by which they were decided."). The court of appeals correctly applied our caselaw when it declared, "[B]ecause the protected right, the alleged wrong, the recovery sought, and the relevant evidence in the current tort lawsuit are different than in the prior contract lawsuit, claim preclusion does not apply to bar the plaintiff's tort claim." Rather than depart from our unwavering same-claim, same-evidence caselaw, I would hold the course.

**C. Pragmatic Considerations.** The majority focuses primarily on pragmatic considerations in moving away from the same-claim, same-evidence approach. To the extent relevant, I have a different view of the pragmatic implications of this case.

First, by requiring the bad-faith claim to be joined in the breach-of-contract action whenever there is notice of a potential claim, we run the risk of complicating, not simplifying, the litigation process. Prior to this case, the parties could litigate the relatively simple and contained policy claim first. If the plaintiff did not prevail, that would be the end of the matter, as a bad-faith claim cannot be brought after an unsuccessful policy claim. *See Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 207 (Iowa 1995) (upholding denial of coverage, resulting in failure of bad-faith claim). The majority rule may tend to unnecessarily escalate disputes by requiring joinder of contract and bad-faith claims if the plaintiff is on notice of such a claim.

Further, the notice question will generate litigation regarding what plaintiffs knew and when they knew it. Moreover, the question of what amounts to notice will generate a body of caselaw; it seems to me, at a minimum, a mere assertion by plaintiff's counsel of the possibility of a future bad-faith claim—a standard lawyer's tactic that does not amount to notice—should not be enough. In any event, the notice feature of the majority opinion will generate a new arena of dispute not present in current law.

Further, the requirement that the plaintiffs join a bad-faith claim to a contract action in order to preserve it gives rise to a number of thorny issues. Will there be simultaneous discovery, or will discovery of the contract claim go first? Thus, a preliminary battle must be fought at the beginning of the litigation over proper sequencing. In this case, the district court indicated that if the contract and bad-faith claims were joined, discovery would proceed first on the contract claim. *See Warnke v. IMT Ins. Co.*, 657 N.W.2d 715, 716–17 (Iowa 2003) (per curiam); *see also Brown*, 670 P.2d at 728 n.1 ("[T]here are many problems involved in

allowing a claimant simultaneously to pursue both a claim under the coverage provided by the policy and a bad-faith claim based upon the insurer's refusal to pay the policy claim. One could plausibly argue that the law should not allow such simultaneous actions and that a bad-faith claim can be pursued only after disposition of the underlying policy claim."). Only after the contract claim was resolved would there be discovery on the bad-faith claim, including potential disclosure of the claims file and other internal documents related to the insurer's handling of the claim. There would thus be apparently two separate juries to consider each claim. Very little would be gained in terms of efficiency under this scenario.

On the other hand, a court could allow simultaneous discovery on all issues. *See, e.g.*, *Handley*, 467 N.W.2d at 250. If there is simultaneous discovery on both issues, the efficiency goals of the majority may also be minimized as the hand-to-hand combat on discovery issues that often accompanies a bad-faith claim may engulf the proceedings. The complications can include questions regarding the proper scope of work product and attorney–client privileges, whether an exception to these privileges applies, or whether the protections generally afforded by these privileges has been waived. *See* Ashley at § 10:29–:31 (discussing discovery in bad-faith cases involving attorney–client privilege, work product, and discovery of reserves); 1 Steven Plitt & Jordan Ross Plitt, *Practical Tools for Handling Insurance Cases* § 7.24 (2011); Donna Gooden Payne, Note, *Insurer Bad Faith: The Need for an Exception to the Attorney–Client Privilege*, 11 Rev. Litig. 111 (1991); Steven Plitt, *The Elastic Contours of Attorney–Client Privilege and Waiver in the Context of Insurance Company Bad Faith: There's a Chill in the Air*, 34 Seton Hall L. Rev. 513 (2004). In short, under the majority approach,

there may be more bad-faith claims, more focus on bad-faith discovery, and few expeditious resolutions of contract disputes.

Second, the majority opinion puts attorneys in a potentially difficult position. The majority fires a warning shot that bringing a bad-faith claim could give rise to sanctions yet requires the claim to be brought in a breach-of-contract action when the claim may not be fully developed. *See Camus v. State Farm Mut. Auto. Ins. Co.*, 151 P.3d 678, 681 (Colo. App. 2006). The end result is that an attorney will have the following choice: bring the claim at the onset of the litigation and risk sanctions, or seek to develop the claim through the contract case and amend later. The latter course, however, might run the risk that the amendment might be denied as an undue expansion of issues. Further, to the extent the majority's new regime discourages plaintiff's counsel from bringing a bad-faith claim at the outset but requires a later amendment dramatically broadening proceedings as the claim develops, there is a very real prospect that continuances may be required to allow the parties to fully develop the later claim.[9]

In the end, I doubt that much efficiency will be achieved by the majority's approach. The chairs on the deck have certainly been rearranged. Our prior same-claim, same-evidence precedents have been seriously undermined, if not effectively overruled, at least in the context of first-party bad-faith insurance litigation. Certainly little will be achieved, and much may in fact be lost, by the majority's departure from this court's long line of same-claim, same-evidence precedents. The

---

[9]The majority opinion also turns the attention of defense counsel toward possible sanctions in bad-faith litigation. I doubt that the majority's use of the sanctions as bellows to blow judicial air over the hot coals of bad-faith controversies will have a cooling effect.

holding does, however, deny the plaintiff his day in court on this potentially valid bad-faith claim, no question about that. I would have thought this court would prefer to give a party a day in court rather than pursue the speculative benefits that will supposedly result from the court's departure from our established caselaw.

In conclusion, I note that the majority does not overrule our cases emphasizing the role of the same claim and the same evidence. Thus, these factors will continue to inform our view of claim preclusion under the Restatement (Second), section 24, and will likely produce a narrower view of the application of the doctrine under Iowa law than under more aggressive caselaw in other jurisdictions.

### III. Conclusion.

For the above reasons, I would reverse the decision of the district court and remand this case for trial of the bad-faith claim.

Wiggins and Hecht, JJ., join this dissent.