# IN THE SUPREME COURT OF IOWA

No. 18–1416

Filed June 12, 2020

**HAROLD YOUNGBLUT,**

    Appellee,

vs.

**LEONARD YOUNGBLUT,**

    Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, Andrea J. Dryer, Judge.

A beneficiary under a will appeals a judgment entered on a jury verdict on a claim of tortious interference with inheritance. **REVERSED AND REMANDED.**

Philip A. Burian and Robert S. Hatala of Simmons Perrine Moyer Bergman, PLC, Cedar Rapids, for appellant.

David J. Dutton and Nathan J. Schroeder of Dutton, Daniels, Hines, Kalkhoff, Cook & Swanson, P.L.C., Waterloo, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This case presents the question whether a disappointed heir can decline to pursue a will contest and instead bring a later, separate lawsuit against one or more favored heirs for wrongfully inducing the testator to execute that will. After careful review of the Iowa Probate Code, recent authority, and underlying policy considerations, we conclude that such a "probate bypass" should not be permitted. Accordingly, we hold that a claim alleging that the decedent's will resulted from tortious interference by a beneficiary must be joined with a timely will contest; otherwise, it is barred. For this reason, we reverse the judgment in favor of the plaintiff in this case and remand for further proceedings.

### II. Facts and Procedural Background.

As the caption might suggest, this case involves an intrafamily dispute. The parties are two brothers, Harold and Leonard Youngblut. Their parents, Earl and Agnes Youngblut, were successful farmers in Black Hawk and Tama Counties for many years until they died a day apart from each other in 2014.

During their lifetime, Earl and Agnes accumulated approximately 385 acres of farmland in Black Hawk County. These included the 155-acre "Peters Farm," and another farm comprising some 230 acres that contained the acreage where they lived. Earl and Agnes also owned about 150 acres of farmland in Tama County. In addition to the 535 acres owned outright, Earl and Agnes also rented other land for farming purposes; altogether their annual farming operation typically covered 1500 to 1800 acres.

Earl and Agnes parented twelve children, three of whom predeceased them. Plaintiff Harold and defendant Leonard were the only

two surviving sons. From a young age, both Harold and Leonard were involved in working the family farm.

In 1980, Earl and Agnes formed a corporation, Youngblut Farmland Ltd. (YFL) and transferred most of their farm-related assets into it. These included the Black Hawk County farmland and their farm equipment. Earl and Agnes retained in their own names the Tama County farmland, dubbed the "South Farm."

Both Harold and Leonard continued to work on the Youngblut family farm as adults. Harold participated continuously except for about seven or eight years during the farm crisis of the 1980s when he moved out of state and took on other work. Upon his return to Iowa in 1992 or 1993, he resumed farming on the family farm.

Leonard worked on the family farm through the 1980s and most of the 1990s. In 1998, he left over a dispute with Harold. Thereafter he turned to other employment in Black Hawk and Tama Counties and did not return to farming.

Beginning in the 1980s, as a form of estate planning, Earl and Agnes regularly transferred shares in YFL to their children. By 2002, Harold was actually managing YFL and the family farming operation; he became the president of YFL in 2006. Earl and Agnes anticipated that Harold would ultimately control YFL, while the other children would have their shares redeemed in cash. Meanwhile, with Harold as president, YFL pledged assets and loaned money to support Harold's personal business ventures, including land development and a Gold's Gym.

In 2010, one of Earl and Agnes's daughters died, and her YFL shares were redeemed by the corporation. In 2011, Earl and Agnes executed new mirror wills. In the 2011 wills they left their property to each other, but upon the last of them to die, their YFL shares and the South Farm passed

to Harold, while the rest and residue of the estate would be divided equally among Leonard and the other children. By this time, Earl was approaching ninety years old and totally retired from farming; Harold later recalled that 2011 or 2012 was the last time Earl drove the combine at harvest.

In March 2013, Leonard sent an email to his siblings that he labeled, inaptly, as a "Family Togetherness Plan." This email criticized the manner in which YFL had been run, accused Earl of sexism, and attacked Harold over his religion. Leonard proposed a new distribution of the family assets among the siblings. Under it, Harold would receive the Peters Farm, Leonard would receive the South Farm, and the daughters would receive everything else. Leonard's email also threatened litigation.

Later that year, arrangements were made to redeem the YFL shares owned by the remaining seven daughters. Accordingly, two of the daughters were cashed out for $250,000 each; the other five received $50,000 down with the $200,000 balance to be paid in installments over ten years. Following these redemptions, Earl owned 30.28% of YFL, Agnes owned 30.28%, Harold owned 15.21%, Leonard owned 13.15%, and other relatives owned the remaining 11.08%.

In January 2014, Earl and Agnes moved into an assisted living home with the help of Harold and Harold's family. A scene arose when Leonard showed up on moving day; he threatened to have Harold arrested. On February 5, Leonard sent an email to the siblings disparaging Harold and threatening legal action. After Earl and Agnes moved into the assisted living home, Earl suffered a stroke. Agnes, meanwhile, was enduring the effects of terminal cancer. Harold recalls "there were times where both of them had difficulty understanding things."

On February 22, Harold had his parents sign a four-year lease for him to rent the South Farm. On March 5, Earl and Agnes also deeded the house they had recently vacated to Harold.

Two days later, on March 7, Earl and Agnes executed new mirror wills. Like the 2011 mirror wills, the 2014 mirror wills provided that Harold would receive his parents' YFL shares. However, the South Farm would now go to Leonard provided he tendered his YFL stock to Harold for one dollar. The rest and residue of the estate would be divided among the seven daughters. Finally, each of the new wills contained an *in terrorem* clause:

> Should any person contest the validity of this Last Will and Testament, any provisions made for said person under the terms of this Last Will and Testament shall lapse, and said person shall be treated as if he or she had predeceased me, leaving no issue him or her surviving me.

Harold found out in March that his parents were contemplating changing their wills:

> Q. Did you know what changes your parents were going to make in that will change in March of 2014? A. The only thing that was ever circulated was about Leonard getting the South Farm.
>
> Q. Did your parents ever say specifically that that was the change they were going to make? A. And I don't remember if it was before or after, but yes.
>
> Q. And tell us what you were told and by whom. A. That, you know, the girls and Leonard all felt that he should get the farm and that I was just a greedy SOB if I didn't just say "okay," and that, you know, they just -- at one point Mom said to me, "I just want them to shut up and go away," is how she phrased it.

By May, Harold was aware of the actual terms of the new will and believed Leonard and his sisters had improperly influenced their parents.

On June 1, Earl passed away. Agnes died the following day. Their 2014 mirror wills were probated.

The statutory deadline for contesting the will of Agnes (the last to die) was October 20. Prior to that time, Harold consulted an attorney about contesting the will. He decided not to, in part because of a concern that he could end up being disinherited under the *in terrorem* clause if the contest failed.

In March 2015, Leonard tendered his YFL shares to Harold for $1 and received title to the South Farm. Harold estimated that YFL at that time might be worth between $5.6 million and $6 million and the shares he received from Leonard were worth $400,000.

Eight days after receiving Leonard's YFL shares on March 25, Harold sued Leonard and three of his sisters on April 2 in the Iowa District Court for Black Hawk County for tortious interference with an inheritance. The suit alleged that the defendants "engaged in conduct designed to defeat their parents' Estate Plan and to substitute their own plan which would inure to their own benefit." It alleged that they "exert[ed] undue influence on their parents to change their Estate Plan." It further alleged that they "intentionally, improperly and maliciously interfered with the Wills and bequests of their parents, Earl and Agnes Youngblut, and . . . substituted their own testamentary plan for their own benefit."

The three sisters reached settlements with Harold totaling $80,000 and were dismissed before trial. Meanwhile, Leonard moved for summary judgment. He asserted that Harold was barred from seeking tortious-interference damages based on the change of estate plan reflected in the 2014 wills because he had failed to file a timely will contest. Leonard also asserted that Harold was estopped from claiming the 2014 wills were the product of tortious interference after accepting the benefits thereunder,

specifically the opportunity to obtain Leonard's YFL shares for $1. Leonard's motion was denied, and the case against Leonard proceeded to a jury trial.

At the close of evidence, Leonard moved unsuccessfully for a directed verdict on the same grounds he had previously urged for summary judgment. The jury was instructed that for Harold to recover, he had to prove that Leonard "intentionally interfered with the expected inheritance by the wrongful means of A. defamation, or B. fraud, or C. duress, or D. undue influence for the purpose of inducing Agnes Youngblut to make a change to her will." The jury was also instructed that

> [a] lawsuit for intentional interference with a bequest or inheritance is not the same as an action to contest or set aside a will. It is an independent cause of action that focuses on a wrongdoer's unlawful intent to prevent another from receiving a request or inheritance rather than on the mental state of the maker of the will.

Additionally, the jury was told that if it found for Harold on his claim, it should award as actual damages "the loss of the inheritance that he expected to receive, minus the value of the [YFL] stock that he received from Leonard Youngblut."

The jury returned a verdict in favor of Harold in the amount of $396,086.88, plus punitive damages of $200,000. Leonard moved for a new trial. He also asked the district court to offset the $80,000 in prior settlements. The district court denied both motions. Leonard appealed, and we retained the appeal.

### III. Standard of Review.

"We review a denial of a motion for directed verdict for correction of errors at law." *Fry v. Blauvelt*, 818 N.W.2d 123, 134 (Iowa 2012).

**IV. Legal Analysis**.

Leonard argues Harold cannot intentionally forego a timely contest to Agnes's 2014 will and later bring a suit for tortious interference against a beneficiary of that will on the theory that the beneficiary exercised improper and undue influence over the testator. Alternatively, Leonard argues that Harold's acceptance of benefits under the will estops him from claiming that the will was induced by tortious interference. Finally, Leonard argues that even if we uphold the jury verdict against him, he is entitled to an offset for the $80,000 in settlements his sisters paid to Harold. For purposes of this appeal, we reach only the first argument.

**A. The Legal Landscape in Iowa.** Iowa Code sections 633.308 through 633.320 govern actions to set aside or contest wills. Iowa Code §§ 633.308–.320 (2015). Section 633.311 provides that a will contest is triable at law. *Id.* § 633.311. Section 633.309 provides that a will contest must be filed

> within the later to occur of four months from the date of second publication of notice of admission of the will to probate or one month following the mailing of the notice to all heirs of the decedent and devisees under the will whose identities are reasonably ascertainable.

*Id.* § 633.309. Harold declined to bring a will contest and instead allowed the October 20, 2014 deadline to lapse.[1]

Nearly five decades ago, in *Gigilos v. Stavropoulos*, we held that heirs of a decedent could not bring a separate, stand-alone fraud action against the executor and beneficiary of a will. 204 N.W.2d 619, 622 (Iowa 1973).

---

[1]As noted, the record suggests that Harold may have been concerned about the *in terrorem* clause in the will. There is Iowa precedent that such clauses have no effect where the contest is pursued in good faith and on probable cause. *See Geisinger v. Geisinger*, 241 Iowa 283, 294, 41 N.W.2d 86, 93 (1950); *In re Cocklin's Estate*, 236 Iowa 98, 111–12, 17 N.W.2d 129, 135–36 (1945); *see also In re Estate of Spencer*, 232 N.W.2d 491, 499 (Iowa 1975).

The heirs alleged that the will was forged and sought "damages for the value of the estate and . . . exemplary damages against [the executor/beneficiary] and the two attesting witnesses to the will." *Id.* at 620. We reasoned,

> It is clear the action is a collateral attack on the order admitting the will to probate. A direct attack was available to plaintiffs in the form of an action to set aside the will. It appears such a direct attack was later separately undertaken but the plaintiffs have not succeeded in contesting the will. We note the will contest resulted in a verdict in favor of the proponents and that verdict is now the subject of post-trial motions in district court. The first question is whether plaintiffs' claim will be heard unless and until the order admitting the will is set aside. The clear answer is that it will not.
>
> . . . .
>
> "The general rule is that a judgment or decree admitting a will to probate, when made by a court having jurisdiction thereof, may be attacked only in such direct proceedings as are authorized by a statute, and is not open to attack or impeachment in a collateral proceeding . . . ."

*Id.* at 620–21 (quoting 95 C.J.S. *Wills* § 578, at 687).

However, just a few years later, in *Frohwein v. Haesemeyer*, we qualified the principle we had announced in *Gigilos*. 264 N.W.2d 792, 795 (Iowa 1978). The *Frohwein* case arose after the plaintiff filed a will contest, which was dismissed on the basis of the statute of limitations. *Id.* at 793–94. The plaintiff then brought a separate lawsuit alleging that "the defendants maliciously, fraudulently, and unlawfully through deceit and undue influence" caused the decedent to revoke her prior will and leave her entire estate to one of the defendants. *Id.* at 794. We held that the trial court erred in transferring the claim to probate and dismissing it. *Id.* at 795–96. We said that *Gigilos* was distinguishable, "since we do not view the law action instituted by the plaintiff here as a collateral attack on the probate order although the allegations of plaintiff's petition in the law

action could have been presented in a will contest." *Id.* at 795. We explained that "an independent cause of action for the wrongful interference with a bequest does exist." *Id.*

Subsequently, in *Huffey v. Lea*, we squarely confronted the issue of "whether the doctrine of claim preclusion prevents an action for tortious interference with a bequest when the action is not brought with the underlying will contest." 491 N.W.2d 518, 519 (Iowa 1992) (en banc). In June 1986, the decedent had executed a will providing that the family farm would go to her nephew. *Id.* In July 1986, the decedent had executed another will revoking the prior will and transferring the farm to her brother and his children. *Id.* After the decedent passed away in August 1986, the July will was admitted to probate. *Id.* However, the nephew was successful in contesting the will and getting it set aside. *Id.* Thereafter the nephew sued the brother and his family for tortious interference. *Id.* at 519–20. The district court dismissed the lawsuit based on claim preclusion, and the nephew appealed. *Id.* at 520.

We reversed. *Id.* at 519. We first noted that *Frohwein* had "recognized a law action for tortious interference with a bequest." *Id.* at 520. We also pointed out the Restatement (Second) of Torts approved of this action, noting that section 774B provides,

> One who by fraud[, duress] or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to others for the loss of the inheritance or gift.

*Id.* (quoting Restatement (Second) of Torts § 774B, at 58 (Am. Law Inst. 1979)). Next we applied the "same evidence" test and found that a will contest and an intentional-interference case involved "differences in proof":

When a will is contested on grounds of undue influence and lack of testamentary capacity, as it was here, the required proof focuses on the testator's mental strength and intent and whether infirmities or undue influence have affected the disposition of property under the will. The necessary proof in an action for intentional interference with a bequest or devise focuses on the fraud, duress, or other tortious means intentionally used by the alleged wrongdoer in depriving another from receiving from a third person an inheritance or gift. Stated simply, in a will contest, the testator's intent or mental state is the key issue; in an intentional interference case, the wrongdoer's unlawful intent to prevent another from receiving an inheritance is the key issue. Because of the differences in proof, the actions are not the same nor will the same evidence necessarily support both actions.

*Id.* at 521 (citations omitted).

There was a dissenting view. *See id.* at 523 (McGiverin, C.J., dissenting). The dissent argued that the tortious-interference claim should not go forward because "[a]n adequate remedy has already been provided." *Id.* at 524 (emphasis omitted). It also maintained that "[c]laim preclusion bars the present action." *Id.* at 525 (emphasis omitted). The dissent explained,

I believe Huffey's action for tortious interference with a bequest constitutes basically the same "claim" as the undue influence claim upon which his prior will contest was based. . . .

Although the legal elements of each claim do not parallel one another with mathematical precision, it is apparent from the general nature of each, and from review of the pleaded facts in this case, that a law action for tortious interference with a bequest necessarily must be supported by the same facts and evidence supporting a will contest in probate based on undue influence.

*Id.* The dissent added, "[T]he district court would have had jurisdiction of both claims had they both been brought at the same time." *Id.* at 527.

Also, *Huffey* was at odds with a decision we had rendered just the year before reiterating the vitality of *Gigilos*. *See Abel v. Bittner*, 470 N.W.2d 348, 351 (Iowa 1991). In *Abel*, the beneficiaries under a will

brought a contest challenging three codicils to that will. *Id.* at 349. The first codicil eliminated their bequest; the second and third codicils reaffirmed the first codicil. *Id.* Later, the beneficiaries brought a law action seeking damages for tortious interference with an inheritance expectancy. *Id.* Still later, they dropped their challenges in the will contest to the second and third codicils. *Id.* at 350. At this point, the district court granted summary judgment to the defendant on all remaining claims. *Id.*

We affirmed. *Id.* at 351. We agreed with the district court that under the doctrine of reaffirmation, the will contest could not proceed as to the first codicil once the beneficiaries had withdrawn their challenges to the second and third codicils. *Id.* Relying on *Gigilos*, we also held that the disposition of the will contest in the defendants' favor doomed the plaintiffs' tortious-interference claim. *Id.* We stated that the defendants "were also entitled to judgment as a matter of law in the law action as a result of the rule prohibiting collateral attack on testamentary dispositions." *Id.* *Huffey* didn't discuss *Abel* despite the inconsistency between the two decisions.

Since *Huffey* was decided in 1992, we have not heard on appeal another tortious-interference-with-inheritance claim. In *Turner v. Iowa State Bank & Trust Co. of Fairfield*, we did cite *Huffey* with approval. 743 N.W.2d 1, 6 (Iowa 2007) (citing *Huffey*, 491 N.W.2d at 520 (majority opinion), as "reaffirming that Iowa recognizes an independent action outside the probate code for tortious interference with a bequest").

**B. Recent Developments in this Area of the Law.** The district court relied on *Frohwein* and *Huffey* in ruling that Leonard was not entitled to judgment as a matter of law. Leonard argues there have been significant developments in the law since those cases were decided.

For one thing, the Restatement (Third) of Torts has moved away from the position of the Restatement (Second) of Torts that we relied upon in *Frohwein*. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 19, at 160–61 (Am. Law Inst. 2020). The Third Restatement limits the ability to pursue a claim for tortious interference with an inheritance or gift: "A claim under this Section is not available to a plaintiff who had the right to seek a remedy for the same claim in a probate court." *Id.* § 19(2). Comment *c* to this section adds,

> Thus if the defendant coerced the decedent into executing a will that excluded the plaintiff, the plaintiff's appropriate response is a claim to that effect in the probate court where the will is tested. A claim in tort is not available.
>
> . . . .
>
> A proceeding in probate is considered available, for purposes of this Section, even if it offers less generous relief than would be attainable in tort. Nor does a probate court become unavailable because the limitations period has expired for pursuing a claim there. If a claim falls within a probate court's jurisdiction, or would have if timely, permitting a suit in tort is not appropriate.

*Id.* § 19 cmt. *c*, at 162–63. The reporter's note states, "This Section emphasizes the importance of limiting tort claims to avoid interference with other mechanisms for resolving disputes about inheritances." *Id.* § 19 reporter's note *a*, at 166. The reporter's note further states that the "contrary view" in *Huffey* is being "disapproved here." *Id.* § 19 reporter's note *c*, at 167.

When new iterations of the Restatement of Torts appear, we have often cited and relied on them in our decisions. *See, e.g., Ludman v. Davenport Assumption High Sch.*, 895 N.W.2d 902, 910 (Iowa 2017); *Dinsdale Const., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 653 n.12 (Iowa 2016); *Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 447 (Iowa

2016); *Estate of McFarlin v. State*, 881 N.W.2d 51, 60 (Iowa 2016); *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 114 (Iowa 2011); *Van Fossen v. MidAm. Energy Co.*, 777 N.W.2d 689, 697 n.8 (Iowa 2009); *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002).

Also, a thoughtful scholarly article in the Stanford Law Review has criticized the conceptual basis for the tort. *See* John C.P. Goldberg & Robert H. Sitkoff, *Torts and Estates: Remedying Wrongful Interference with Inheritance*, 65 Stan. L. Rev. 335, 337 (2013) [hereinafter Goldberg & Sitkoff] ("[W]e argue that the interference-with-inheritance tort should be repudiated."). The professors write,

> [I]n almost any circumstance in which a prospective beneficiary could make out a tort claim to remedy wrongful interference with an expected inheritance, those same interests could be vindicated through the traditional inheritance law procedures of a probate will contest or an action in restitution. . . .
>
> What makes the redundancy between tort law and inheritance law pernicious is that tort, as a general law of wrongful injury, is ill-suited to posthumous reconstruction of the true intent of a decedent. Such an undertaking, which is hampered by the inability of the decedent to give testimony to authenticate or clarify his intentions, requires the court to distinguish between legitimate persuasion and "undue influence" or "duress," and to do so in the context of nuanced family dynamics and customs that are often inaccessible to outsiders. In contrast to tort law, inheritance law has developed a host of specialized doctrines and procedures to deal with these difficulties. There is thus little reason to suppose that tort concepts and procedures, which have developed primarily to deal with less subtle forms of injurious misconduct, will help courts better distinguish a bona fide claim of wrongful interference from a strike suit by a disappointed expectant beneficiary.
>
> Because the interference-with-inheritance tort changes the rules under which inheritance disputes are litigated and offers different remedies than inheritance law, recognition of the tort is in truth recognition of a rival legal regime for addressing these same problems. The tort allows a

disappointed expectant beneficiary to choose his preferred rules of procedure and potential remedies—the specialized rules of inheritance law, or the general civil litigation rules of tort law. This development is troubling because it has arisen without consideration of the reasons for the specialized rules of inheritance law. Courts have offered little justification for the creation of this alternative regime. Some have reasoned, incoherently, that the tort is redundant with inheritance law yet necessary to fill gaps in that law. Other courts have allowed interference claims to proceed under different rules and to obtain different remedies for no other reason than the plaintiff chose to sue in tort rather than to bring a will contest or an action in restitution.

*Id.* at 338–39 (footnote omitted). *Huffey* is singled out for criticism in the article: "A clearer example of the tort overriding purposeful limitations within inheritance law could scarcely be imagined." *Id.* at 379.

Another commentator has expressed misgivings about the intentional-interference-with-inheritance claim for related reasons:

One frequently cited reason for allowing recovery for intentional interference with inheritance is that every wrong should have a remedy. Yet the facts giving rise to the tort are often identical to facts giving rise to a will contest. If either action would provide an adequate remedy, the plaintiff should be limited to the probate action because that is the preferred method for resolving issues related to wills.

Nita Ledford, Note, *Intentional Interference with Inheritance*, 30 Real Prop., Prob. & Tr. J. 325, 340 (1995) (footnotes omitted).

A third commentator would allow the tort even if a probate proceeding provides a remedy—but only after exhausting the probate remedy first:

In some cases involving direct interference with a testator's testamentary intent, the person injured by the conduct could obtain relief in probate. For example, the intestate heir who can oppose a will that the testator was tortiously induced to execute would have probate relief available. The claimant would have standing in probate, and defeating the will could give the claimant the benefit he expected, although he won't recover punitive damages and attorney's fees without a trip to civil court, if such is permitted

in his jurisdiction. In these cases, the claimant should exhaust probate before any resort to civil court.

Irene D. Johnson, *Tortious Interference with Expectancy of Inheritance or Gift—Suggestions for Resort to the Tort*, 39 U. Tol. L. Rev. 769, 789 (2008).

Additionally, enthusiasm for the tort appears to be waning in the most recent decisions from other jurisdictions. Recently, the South Dakota Supreme Court, in answering a certified question, decided it would not adopt the tort of intentional interference with an inheritance. *In re Certification of Question of Law from the U.S. Dist. Ct.*, 931 N.W.2d 510, 518 (S.D. 2019). Among other things, our South Dakota colleagues observed that recognition of the tort would undermine the legislature's plan to have expeditious trust administration following death. *Id.* at 517–18. The court elaborated,

> Thomas suggests the tort action would not run afoul of this legislative policy because the claim would lie against the individual wrongdoer rather than the trust. However, his suggestion, alone, does not lead us to conclude that the expeditious administration of trusts prioritized by the Legislature would be unaffected by recognizing the tort. Most importantly, Thomas makes no claim that he was unable to challenge the trust in this case because of the shortened repose period, and he only hypothesizes that a future litigant could be denied a remedy because of the repose period.

*Id.* at 518.

The Kentucky Court of Appeals also declined to recognize the tort last year. *See Dickson v. Shook*, ___ S.W.3d ___, ___, 2019 WL 1412497, at *6 (Ky. Ct. App. Mar. 29, 2019). The court emphasized that it "has not hesitated, on occasion, to recognize torts for the first time." *Id.* But it observed that the legislature had already provided a remedy through the probate system. *Id.*

Likewise, four years ago, in *Archer v. Anderson*, the Texas Supreme Court discussed the Goldberg and Sitkoff article at length, overruled

several Texas Court of Appeals decisions, and concluded that "[t]he tort of intentional interference with inheritance is not recognized in Texas." 556 S.W.3d 228, 231–32, 234–35, 239 (Tex. 2018). The court characterized the appellants' position as an "argument . . . for a different probate process than the Legislature has created." *Id.* at 238. A concurring opinion would have disallowed the claim where the plaintiff had "adequate remedies otherwise" through the probate system but left open the possibility of a claim in other circumstances where "the tort would provide the only avenue for relief." *Id.* at 240, 245 (Johnson, J., concurring).

The year before that, in *Litherland v. Jurgens*, the Nebraska Supreme Court "decline[d] to adopt the tort of intentional interference with an inheritance." 869 N.W.2d 92, 99 (Neb. 2015). The court observed that "[t]he remedies available . . . in the probate court were adequate." *Id.* at 97. It noted its "general preference for resolving disputes pertaining to wills and inheritances in probate court." *Id.*

Additionally, in 2016, in *Villarreal v. United Fire & Casualty Co.*, we embraced the view of the Restatement (Second) of Judgments section 24 and held that a policyholder seeking recovery of benefits from an insurer had to bring a bad-faith claim together with the breach-of-contract claim to avoid the potential effects of claim preclusion when both claims arose out of the same transaction. 873 N.W.2d 714, 719–22, 728–29 (Iowa 2016). It did not matter that bad faith would require "some *additional* proof." *Id.* at 729. We explained, "Perfect identity of evidence is not the standard in Iowa for whether claim preclusion applies." *Id.*

A dissenting opinion in *Villarreal* remarked that "[t]he majority opinion in this case essentially adopts the view espoused by the *Huffey* dissent." *Id.* at 737 n.8 (Appel, J., dissenting). It added, "Whether *Huffey* is good law after today is unclear." *Id.*

**C. Should Tortious Interference Be Allowed to Bypass a Will Contest?** In considering what the status of *Frohwein* and *Huffey* should be today, we are not persuaded by those courts and commentators who see *no* role for the tort of intentional interference with an inheritance. The tort has value in circumstances when a probate proceeding cannot provide an adequate remedy. But it should not be a de facto *substitute* for a will contest. There are several reasons for this.

First, probate is meant to provide a prompt, efficient, centralized way of resolving issues relating to a decedent's estate and getting the estate distributed. That is one reason for the tight deadlines in probate. *See, e.g.*, Iowa Code §§ 633.309, .355, .410(1). For example, creditors generally have only four months from the date of the second publication of the notice to creditors to bring claims. *Id.* § 633.410(1). They can file a separate action outside probate court, but the same deadline applies. *Id.* § 633.415(2). Unless the court for cause shown determines otherwise, "the personal representative shall deliver all specifically devised property to the devisees entitled thereto after the expiration of twelve months from the date of appointment of the personal representative." *Id.* § 633.355. Allowing a separate, subsequent challenge to the will's plan of distribution based on a theory of tortious interference could defeat this purpose.

In *In re Estate of Thompson*, we reinforced the importance of these deadlines by holding that the doctrine of fraudulent concealment could not extend the time for challenging a will. 346 N.W.2d 5, 8 (Iowa 1984). We explained, "The primary motivation for litigants in will contest challenges is dissatisfaction with the contents of the will, a circumstance which can ordinarily be relied upon to trigger any existing challenge within the statutory period."

*Id.* The same basic point applies here. When a tortious-interference claim is based on "dissatisfaction with the contents of the will," there is no reason it cannot be joined with and brought at the same time as the challenge to the will itself. Efficiency favors this outcome. There is a benefit in knowing that if the statutory deadline passes without event, the testamentary plan of distribution will not be disturbed either by a will contest or by an action that seeks equivalent damages on equivalent grounds.

Second, undue influence is a well-developed probate concept. We have discussed its elements in depth in many cases. *See, e.g., Burkhalter v. Burkhalter*, 841 N.W.2d 93 (Iowa 2013). For example, in *Burkhalter*, we reiterated prior law that causation must be "clearly" established in an undue-influence case. *Id.* at 105–06. We elaborated as to why this was so:

> A heightened causation element in undue influence cases makes sense. In cases involving challenges to wills based upon undue influence, the central issue is whether the acts of the testator were a product of free will or coercion. The testator, however, is not available to testify and, as a result, a speculative element is necessarily introduced into the claim. As colorfully noted in the commentary, will contests necessarily apply a "worst evidence" rule.
>
> Further, it is not always easy to distinguish ordinary permissible influences on a testator from improper coercion. The injection of the word "clearly" into the fourth element of undue influence is designed to add a measure of protection to the free will of a testator, filter out claims that are unduly speculative, and to prevent the doctrine from expanding beyond its limited scope.

*Id.* (citation omitted). Allowing a disappointed heir to pursue a separate tortious-interference claim in lieu of an undue-influence claim would cut against this reasoning. After all, the same issues are present in both cases—the testator who is "not available to testify" and the difficulty of

"distinguish[ing] ordinary permissible influences . . . from improper coercion." *See id.* at 105.

Third, as discussed above, *Huffey*'s foundation has been eroded somewhat. *Huffey* relied on Restatement (Second) of Torts section 774B, but the Third Restatement disavows this approach. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 19 reporter's note *a,* at 166–67 (explaining the differences between section 19 and section 744B of the Restatement (Second) of Torts). We have already quoted the following language from *Huffey*:

> Stated simply, in a will contest, the testator's intent or mental state is the key issue; in an intentional interference case, the wrongdoer's unlawful intent to prevent another from receiving an inheritance is the key issue. Because of the differences in proof, the actions are not the same nor will the same evidence necessarily support both actions.

491 N.W.2d at 521. On further reflection, we are not sure this language is correct. To prevail either on an undue influence claim or a tortious-interference claim where the plaintiff is challenging conduct leading to a new will, the plaintiff must prove an outsider overcame the testator's independent will. *See Burkhalter,* 841 N.W.2d at 106 ("[U]ndue influence must dominate the motives of the testator in executing his will." (quoting *In re Estate of Davenport,* 346 N.W.2d 530, 532 (Iowa 1984))); *In re Estate of Bayer,* 574 N.W.2d 667, 671 (Iowa 1998) ("Undue influence must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the influence." (quoting *In re Estate of Davenport,* 346 N.W.2d at 531–32)). If the will reflects the true wishes of the testator, then no claim should lie, either for undue influence or tortious interference. In short, the two claims involve " 'a substantial overlap' of proofs and witnesses" because a central issue

is common to both claims. *See Villarreal*, 873 N.W.2d at 729 (majority opinion) (quoting Restatement (Second) of Judgments § 24 cmt. *b*, at 199 (Am. Law Inst. 1982)).

Fourth, we question how an action for tortious interference with an inheritance—brought later as a belated substitute for a will contest—fits into Iowa's legislative scheme. The legislature has provided that a will contest will be tried as a law action, so a jury trial is available anyway. *See* Iowa Code § 633.311. And when a will contest is brought, interested parties, such as alleged wrongdoing beneficiaries, "shall be joined with proponents [of the will] as defendants. *Id.* § 633.312. Furthermore, Iowa Code section 633.487 is intended to give preclusive effect to the "distribution" and "the list of heirs" as to all persons with notice upon court approval of the final report. *See id.* § 633.487. The final probate decree, in other words, has res judicata effect on everyone who has been given notice. *See In re Estate of Sampson*, 838 N.W.2d 663, 667 (Iowa 2013) ("[S]ection 633.487 essentially cuts off the rights of persons who received notice of the final report to contest distribution or prior acts of administration, except in the case of fraud."). The section does not appear to contemplate separate actions that would have the effect of *overturning* the distribution carried out by a will. The majority opinions in *Frohwein* and *Huffey* did not consider these points.

For these reasons, we now hold that a party alleging a decedent's will was procured in whole or in part by tortious interference must join such claim together with a timely will contest under Iowa Code section 633.308. In doing so, we honor the legislature's goal of prompt and effective estate administration. We also adhere to the burden of proof

considerations we discussed in depth in *Burkhalter*.[2] Additionally, we acknowledge the persuasiveness of some recent scholarly views including that of the Third Restatement. Lastly, we respect the directive in Iowa Code section 633.487 that the distribution coming out of probate should be a final and conclusive distribution unless a specific exception such as reopening applies. *See* Iowa Code §§ 633.308., .487, .488, .489. To the extent that *Frohwein* and *Huffey* are to the contrary, we overrule them.

We emphasize what today's decision does and does not hold. Today's decision is limited to claims that a party tortiously interfered with an inheritance by inducing the decedent to execute a will through wrongful means.[3] Also, today's decision does not foreclose a plaintiff from pursuing additional *remedies* via a tortious-interference claim.[4] It simply holds that the claim of tortious interference must be joined with a timely will contest. That was the position taken by the *Huffey* dissent. *See* 491 N.W.2d at 527 (McGiverin, C.J., dissenting).

The *Huffey* dissent would have disallowed the tortious-interference claim for "two main reasons": it was unavailable under the facts of the case and it was barred by the doctrine of claim preclusion. *Id.* at 524–27. Now persuaded that the *Huffey* dissent was correct, we hold that the common law and principles of claim preclusion do not permit a tortious-

---

[2]To ensure that this burden of proof is not diluted, a jury hearing both a will contest and a tortious-interference-with-an-inheritance claim should be instructed not to reach the tortious-interference claim if they uphold the will. It would not make sense to have a carefully calibrated burden of proof for undue influence, as we discussed in *Burkhalter*, while allowing that burden to be circumvented through a tortious-interference action.

[3]Generally speaking, we agree with the authors of the Third Restatement that where no claim is available in probate court for the conduct in question, then the claim cannot be precluded by failure to bring the claim in probate court. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 19 cmt. *c*.

[4]Thus, in an appropriate case, punitive damages could be available.

interference-with-inheritance claim alleging an improperly obtained will to go forward outside normal probate deadlines and proceedings.

**D. Deciding this Case.** Applying this holding to the present case, it is clear that Harold could have brought a will contest by the October 20, 2014 deadline. He consulted an attorney about doing so but did not go forward. Harold argues that he didn't know until February 2015 whether Leonard intended to exercise his option under Agnes's 2014 will to tender his YFL stock to Harold and receive the South Farm. "[I]f Leonard did not exercise the option, Harold's inheritance would have been the same as it was under Agnes's 2011 will," Harold contends.

Harold's argument does not persuade us for two reasons—one factual and one legal. The factual reason is that Harold has not offered competent proof he postponed bringing suit for this reason. Did Harold really believe Leonard would use improper influence specifically to get rights to the South Farm and then not exercise those rights? That runs contrary to Harold's entire theory of the case.

The legal reason is that any challenge to a will may require the challenger to act before contingencies under the estate plan are resolved. *See* Iowa Code § 633.309. Suppose Harold's theory was a lack of testamentary capacity with respect to the 2014 wills, rather than improper and undue influence. In that event, there is no dispute he would have had to initiate litigation by October 20, even though several months remained for Leonard to exercise his option. Obviously, if Leonard declined to exercise the option, the litigation could be dropped.

In sum, Harold's tortious-interference claim was a de facto substitute for a will contest based on undue influence. One of the "wrongful means" alleged was undue influence itself. Another was its cousin, duress. A third was fraud based on Leonard's false threats to the

family and false statements he had been promised the South Farm. And the final was defamation, based on derogatory statements Leonard made about Harold. As Harold's attorney put it in closing,

> [W]e can tell whether or not the actions, the interference, which is caused by the defamation, the fraud, duress, and undue influence, produced the result that Leonard Youngblut wanted, and it did. He accomplished his goal by getting his parents to change their will, to give him the South Farm.

Harold's attorney referred to a "one-year rant and campaign that Leonard had, to try to convince and force his mother and his father to change their wills."

It is possible that a defamation claim *could* have been asserted against Leonard that would have been legally and factually distinct from his alleged undue influence over the terms of Earl's and Agnes's 2014 wills. But here, defamation was merely one of the wrongful means allegedly deployed by Leonard to induce Earl and Agnes to execute the 2014 wills and thereby deprive Harold of the South Farm.

The petition alleged a single damages claim of tortious interference with inheritance, coupled with an equitable claim seeking to impose a constructive trust on the South Farm on the same grounds. The petition alleged Leonard (and his siblings who settled) "intentionally, improperly and maliciously interfered with the Wills and bequests of their parents, Earl and Agnes Youngblut, and . . . substituted their own testamentary plan for their own benefit."

At trial, Jury Instruction No. 28 made clear that the only actual damages sought by Harold consisted of the "loss of the inheritance that he expected to receive." There was only one verdict form on liability: "Did Harold Youngblut prove that Leonard Youngblut intentionally interfered with Harold Youngblut's expected bequest or inheritance under Agnes

Youngblut's will?  Answer 'yes' or 'no.' "  In sum, this tortious-interference claim challenged the will and nothing but the will.

Whenever we overrule a precedent, it can affect litigants' and lawyers' expectations.  Harold may have relied on *Frohwein* and *Huffey* when he decided not to bring a will contest.  The *Villarreal* decision that arguably presaged today's outcome did not appear until 2016—after the deadline to contest Agnes's 2014 will had passed.  But some other points are worth noting.

One is that Harold, unlike the plaintiffs in *Frohwein* and *Huffey*, deliberately bypassed challenging the will in probate proceedings.  In fact, Harold accepted that will in the probate proceedings.  When asked why he tendered $1 for Leonard's YFL stock, a concession he received in the 2014 will, he testified that he "was just following the will."  We need not decide whether Harold's acceptance of benefits under the 2014 will qualifies as a legal estoppel against his later bringing a tortious-interference claim.  *See, e.g.*, *Hainer v. Iowa Legion of Honor*, 78 Iowa 245, 252, 43 N.W. 185, 187 (1889) ("One who has taken a beneficial interest under a will is thereby held to have confirmed and ratified every other part of the same, and he will not be permitted to set up any right or claim of his own, however legal and well founded it may otherwise have been, which would defeat or in any way prevent the full operation of the will." (quoting Bigelow, *Estop.* 642)).  It is sufficient for present purposes to note that *Frohwein* and *Huffey* are distinguishable from the present case on their facts, and one should not assume they would have controlled the outcome here.

Also, the year before *Huffey*, another decision of ours had expressed the view that a tortious-interference claim operates as an impermissible collateral attack on a probate proceeding.  *See Abel*, 470 N.W.2d at 351.

And the contrary view set forth in *Huffey*, as noted, has been roundly criticized. *See* Goldberg & Sitkoff, 65 Stan. L. Rev. at 379.

Furthermore, *Frohwein* and *Huffey* did not involve interpretation of a statute or a rule, the areas where historically we have been most reluctant to disturb precedent. *State v. Iowa Dist. Ct.*, 902 N.W.2d 811, 817–18 (Iowa 2017); *Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017); *Bd. of Water Works Trs. of Des Moines v. Sac Cty. Bd. of Supervisors*, 890 N.W.2d 50, 60–61 (Iowa 2017*); Hedlund v. State*, 875 N.W.2d 720, 725–27 (Iowa 2016); *Doe v. New London Cmty. Sch. Dist.*, 848 N.W.2d 347, 355–56, 356 (Iowa 2014); *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013); *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 599–600 (Iowa 2011); *In re Estate of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011). Instead, *Frohwein* and *Huffey* were based on principles of common law and judicial administration, areas where the law can evolve as courts learn from experience. Our customary reluctance to overturn precedent remains, but may have less force when we conclude the precedent was erroneous and leads to undesirable results. *See, e.g.*, *Winger*, 881 N.W.2d at 448 (common law); *Peoples Trust & Sav. Bank v. Sec. Sav. Bank*, 815 N.W.2d 744, 754 (Iowa 2012) (judicial administration). As we said in *Barreca v. Nickolas*,

> We remain mindful of the importance of stare decisis as a force of stability and predictability in the law. Where persuasive reasons no longer support a discrete common law rule, however, we are not required to fetter ourselves to that rule simply for the sake of preserving past decisions.

683 N.W.2d 111, 122–23 (Iowa 2004). "The genius of the common law is its flexibility and capacity for growth and adaptation." *Bearbower v. Merry*, 266 N.W.2d 128, 129 (Iowa 1978) (en banc); *see also* Tyler J. Buller & Kelli A. Huser, *Stare Decisis in Iowa*, 67 Drake L. Rev. 317, 322 (2019) ("Common law cases tend to invoke moderately flexible or somewhat weak

stare decisis because 'judges are more akin to lawmakers' in this context, deciding policy questions with limited or no legislative direction.").[5]

For the foregoing reasons, we hold that Harold's claim for interference with inheritance is barred because it was not brought in conjunction with a timely will contest. Leonard's motion for directed verdict should have been granted. We do not reach Leonard's arguments that Harold's claim was barred by some form of estoppel or that the district court should have offset the value of his three sisters' settlements against the actual damages award.

**V. Conclusion.**

We reverse the judgment entered below and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All justices concur except Appel and McDonald, JJ., who dissent in separate dissenting opinions.

---

[5]Also, as already noted, it would be inaccurate to say that we have had "forty years" of continuous recognition of tortious interference with an inheritance as a valid claim independent of probate proceedings. In 1991, *Abel* said otherwise. *See Abel*, 470 N.W.2d at 351.

**APPEL, Justice (dissenting).**

I respectfully dissent. In my view, the principles enunciated forty years ago in *Frohwein v. Haesemeyer*, 264 N.W.2d 792 (Iowa 1978), and twenty years ago in *Huffey v. Lea*, 491 N.W.2d 518 (Iowa 1992) (en banc), should control the outcome in this case.

**I. Forty Years of Iowa Caselaw: Tortious Interference with Expectancy in Inheritance as Claim Independent of and not Precluded by Probate.**

In *Frohwein,* this court considered a case where the plaintiff claimed that the defendant conspired to defraud him by tortiously causing the testator to execute a will. 264 N.W.2d at 793. The district court transferred the case to the probate docket and granted summary judgment to the defendant. *Id.* at 794.

We reversed the district court. We recognized that collateral attacks on an order admitting a will to probate are usually not permitted. *Id.* at 794–95. But we found this principle inapplicable under the facts. We declared,

> [W]e do not view the law action instituted by the plaintiff here as a collateral attack on the probate order although the allegations of plaintiff's petition in the law action could have been presented in a will contest. The plaintiff in this case based his law action on a claimed tortious interference with a bequest in his favor provided him in the prior will of the decedent . . . .

*Id.* at 795. The court in *Frohwein* further stated that we had recognized the tort of wrongful interference with business advantage and that there was "no compelling reason to decline to extend this concept to a non-commercial context." *Id.*

We built on the *Frohwein* precedent in *Huffey,* where this court considered whether claim preclusion prevented an action for tortious

interference with a bequest when the action is not brought with the underlying will contest. 491 N.W.2d at 519. In *Huffey*, the plaintiff had already been successful in a will contest. *Id.* The plaintiff then filed the tortious-interference action to obtain additional remedies against the alleged tortfeasor. *Id.* at 519–20. The defendant argued that the plaintiff was precluded from bringing the claim. *Id.* at 520.

The *Huffey* court held that claim preclusion did not apply.

> Stated simply, in a will contest, the testator's intent or mental state is the key issue; in an intentional interference case, the wrongdoer's unlawful intent to prevent another from receiving an inheritance is the key issue. Because of the differences in proof, the actions are not the same nor will the same evidence necessarily support both actions.

*Id.* at 521.

In addition to differences in proof, the *Huffey* court stressed differences in remedies. The *Huffey* court noted that the plaintiff sought attorney fees, the value of lost time, mental anguish incurred in contesting a will, and punitive damages. *Id.* None of these remedies were available in a will contest. *Id.* Among other things, we stated that "[w]e are strongly committed to the rule that attorney fees are proper consequential damages when a person, through the tort of another, was required to act in protection of his or her interest by bringing or defending an action against a third party." *Id.* at 522.

Importantly, the *Huffey* court examined cases that came to a different result. The *Huffey* court recognized that some states did not permit a claim outside of probate proceedings and explicitly rejected those precedents. *Id.* at 521.

The fact that *Huffey* involved a thorough airing of the issues is further reflected in a dissent. *Id.* at 523 (McGiverin, C.J., dissenting). The dissent challenged the two main propositions of the majority, namely, that

the remedies in probate were not adequate and that claim preclusion was not applicable. *Id.* at 524–27. The dissent further presented caselaw from other jurisdictions supporting the view that the plaintiff's claim should not be permitted. *Id.*

In addition, it is important to note that in *Huffey*, the court considered the issue en banc. Thus, clearly, the court identified the questions presented as important and desired to provide an authoritative precedent on the issues presented.

## II. Caselaw in Other Jurisdictions.

As the majority correctly points out, there are cases in a number of jurisdictions that are contrary to *Frohwein* and *Huffey*. Some states, like the majority in this case, hold that probate provides the only avenue of relief, while others require "exhaustion" of "adequate" probate remedies before bringing a claim, and others still, like *Huffey*, allow a tortious-interference claim after probate in order to provide a complete remedy. *See* Irene D. Johnson, *Tortious Interference with Expectancy of Inheritance or Gift—Suggestions for Resort to the Tort*, 39 U. Tol. L. Rev. 769, 775–76 n.60–63 (2008) (outlining extant caselaw on probate) [hereinafter Johnson, *Tortious Interference*].

But the approach in *Frohwein* and *Huffey* are not lone rangers. For example, in *Barone v. Barone*, 294 S.E.2d 260 (W. Va. 1982), the West Virginia Supreme Court of Appeals recognized the tort as independent of the probate process. *Id.* at 411. In *Plimpton v. Gerrard*, 668 A.2d 882 (Me. 1995), the Supreme Judicial Court of Maine recognized the tort and specifically held that Maine neither imposes an exhaustion requirement or a requirement that the plaintiff show that the probate court remedy was inadequate. *Id.* at 886–87. In *Allen v. Hall*, 974 P.2d 199 (Or. 1999) (en banc), the Oregon Supreme Court, in recognizing the tort, stated,

> If, as alleged here, a party has obtained the benefit of the testamentary intent rule by committing a tort against a third party, the policy of the law should be to provide an avenue for relief from the tortious act. To do so here still would give defendants all the benefits that the testamentary intent rule calls for them to receive. Once possessed of those benefits, however, defendants would be liable to respond in damages for torts that they may have committed—a separate legal inquiry with its own societal justifications.

*Id.* at 203.

### III. Remedial Differences Between Probate and Tort.

There are major differences between a probate contest and the tort of interference with an expectation of inheritance. A tort action is designed to remedy a third-party wrong, while probate is intended to carry out the testator's intent. *See* Johnson, *Tortious Interference*, 39 U. Tol. L. Rev. at 771. In other words, the tort action is against an individual person, while a probate proceeding is in rem. *Id.* at 772. The action for tortious interference provides the remedy of damages against the wrongdoer and not from the estate. *Id.* Further, the allocation of the costs of litigation is materially different, with the estate bearing the cost of defense in a probate proceeding while the potential wrongdoer bears the costs in a tort action. *Id.* As emphatically pointed out in *Huffey*, recovery of plaintiff's attorney fees are available in the tort and not in probate. 491 N.W.2d at 522. Punitive damages are also available in tort and not in probate proceedings. Johnson, *Tortious Interference*, 39 U. Tol. L. Rev. at 772. As a result of the potential of compensatory and punitive damages against the tortfeasor, the tort has deterrent value which cannot be obtained in probate, where the wrongdoer is a passive observer and bears no costs. Jury trial is also available in tort and not in probate. *Id.* at 774. Importantly, the time for making a claim in probate is much shorter than the statute of limitations for intentional interference. *Id.*

The bottom line here is that the tort of interference with the expectation of inheritance is materially different than a will contest, with different structure, different purposes, and different remedies. Further, while this case is postured as procedural, it has real substantive implications. By significantly reducing the available remedies and altering the decision-making process, the substance of the tort of intentional interference with the expectation of inheritance has been undermined. Clearly, the majority has less respect for the tort than the en banc *Huffey* court.

## IV.  Impact of Innovations of Restatement (Third) on Iowa Law.

The Restatement (Second) of Torts section 774B provided that

> [o]ne who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

Restatement (Second) of Torts § 774B, at 58 (Am. Law Inst. 1979). The *Frohwein* and *Huffey* cases were consistent with the provisions of the Restatement (Second). As the majority correctly points out, however, the Restatement (Third) recognizes the tort but with a new wrinkle. Under the Restatement (Third), the tort does not lie where a plaintiff "had the right to seek a remedy for the same claim in a probate court." Restatement (Third) of Torts: Liab. for Econ. Harm § 19(2), at 161 (Am. Law Inst. 2020).

The restatements of the American Law Institute (ALI) are often a helpful resource in the fashioning of Iowa law. The ALI, however, is not an Iowa court or the Iowa legislature. Here, the approach in *Frohwein* has been part of the Iowa legal landscape for forty years and was reinforced in *Huffey* twenty years ago. The *Huffey* case involved consideration by the court en banc and thoroughly explored the issue and the caselaw. The

legislature has had over forty years to correct any error if it so chose. It has not acted. While not binding, we ordinarily give weight to legislative inaction. *See State v. Iowa Dist. Ct.*, 902 N.W.2d 811, 818 (Iowa 2017) (finding legislative acquiescence with statute in effect for ten years without legislative change); *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013) ("When many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation."). I regard legislative inaction as a more powerful factor in this case than the revisions to the Restatement of Torts by ALI.

## V. Impact of *Villarreal.*

In *Villarreal v. United Fire & Casualty Co.*, 873 N.W.2d 714 (Iowa 2016), a majority of this court, wrongly in my view, reinvented our claim-preclusion doctrine and held that a first-party bad-faith action against an insurance carrier must be joined with the underlying breach-of-contract action. *Id.* at 730. I need not repeat the views I expressed in the dissent in *Villarreal*, which I incorporate here in full. *Id.* at 731–41 (Appel, J., dissenting).

The approach in *Villarreal* casts a shadow over this case. But this case is distinguishable from *Villarreal*. In *Villarreal*, the plaintiff was simply required to bring a bad-faith action in the same proceeding as the underlying breach-of-contract claim. *Id.* at 730 (majority opinion). The substance of the bad-faith claim was not affected at all. Here, however, the nature of the litigation changes significantly if a plaintiff alleging intentional interference with an expectation of inheritance is forced to bring the claim in probate. As noted above, the remedies are less favorable, the costs of defense are allocated differently, and the deterrence function of the tort is undermined. I would limit *Villarreal* to cases where

claims can be joined without undermining the purposes of the tort, altering the burdens of defense, and limiting the remedies available to the plaintiff.

## VI. Conclusion.

For the above reasons, I would follow our precedent in *Frohwein* and *Huffey* and affirm the ruling of the district court.

**McDONALD, Justice (dissenting).**

*Stare decisis et non quieta movere*: "to stand by the thing decided and not disturb the calm." *Ramos v. Louisiana*, 590 U.S. \_\_\_, \_\_\_, 140 S. Ct. 1390, 1411 (2020) (Kavanaugh, J., concurring in part). The doctrine of stare decisis holds that courts should defer to precedent. The doctrine has much to commend it. *See State v. Gaskins*, 866 N.W.2d 1, 39–40 (Iowa 2015) (Waterman, J., dissenting) (summarizing "values fostered by stare decisis"). Among other things, stare decisis advances stability and consistency in the law. *See Miller v. Westfield Ins.*, 606 N.W.2d 301, 310 (Iowa 2000) (Cady, J., dissenting). It increases efficiency in the decision-making process. *See* Benjamin N. Cardozo, *The Nature of the Judicial Process* 145 (Dover Publ'ns 2005) (1921) ("[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him."). It promotes respect for the judiciary as a neutral decision-maker and advances the rule of law. *See Gaskins*, 866 N.W.2d at 40.

That being said, the doctrine of "*stare decisis* is 'not an inexorable command.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 585 U.S. \_\_\_, \_\_\_, 138 S. Ct. 2448, 2478 (2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 233, 129 S. Ct. 808, 816 (2009)). There are instances in which a court should overrule a precedent. In nonconstitutional cases, the fact that a later court thinks a precedent was wrongly decided is not, in and of itself, sufficient reason to overrule a precedent. As a rule of decision, the doctrine of stare decisis does real work only when a later court thinks a precedent was wrongly decided. If a later court thinks a precedent was rightly decided, the doctrine of stare

decisis is largely unnecessary to justify continued adherence to a precedent. The real power of the doctrine of stare decisis then is its power to enshrine wrong decisions. The doctrine "reflects 'a policy judgment that "in most matters it is more important that the applicable rule of law be settled than that it be settled right." ' " *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S. Ct. 275, 284 (1997) (quoting *Agostini v. Felton*, 521 U.S. 203, 235, 117 S. Ct. 1997, 2016 (1997)).

To overrule a nonconstitutional precedent it is not enough a precedent be wrong, instead a precedent must be wrong enough. Wrong enough means, among other things, a precedent has proved unworkable in practice, does violence to legal doctrine, or has been so undermined by subsequent factual and legal developments that continued adherence to the precedent is no longer tenable. *See, e.g.*, *Janus*, 585 U.S. at \_\_\_, 138 S. Ct. at 2478–79 (identifying factors relevant in determining whether to overrule precedent, including the quality of the reasoning in the decision, "the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 854–55, 112 S. Ct. 2791, 2808–09 (1992) (identifying relevant considerations for stare decisis inquiry).

This is a high standard. This court has said, "Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015). A compelling reason to change the law "require[s] the highest possible showing that a precedent should be overruled before taking such a step." *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 249 (Iowa 2018) (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005)).

The demanding standard for overruling our precedents has not been met in this case. "In *Frohwein v. Haesemeyer*, 264 N.W.2d 792 (Iowa 1978), we recognized a law action for tortious interference with a bequest." *Huffey v. Lea*, 491 N.W.2d 518, 520 (Iowa 1992). The tort was not and is not well-founded as a matter of theory or doctrine. *See generally* John C.P. Goldberg & Robert H. Sitkoff, *Torts and Estates: Remedying Wrongful Interference with Inheritance*, 65 Stan. L. Rev. 335, 337 (2013). That being said, the tort has been the law of this state for forty-two years. The tort is recognized in the Restatement (Third) of Torts: Liability for Economic Harm. *See* § 19, at 160 (Am. Law Inst. 2020). And the cause of action "has been recognized in courts of about half the states, including most of those that have considered the issue." *Id.* § 19 reporter's note *a*, at 166. These considerations lead me to conclude *Frohwein* should not be overruled.

Similarly, *Huffey* strikes me as wrong but not wrong enough to be overruled. *Huffey* has not proved to be unworkable in practice. In the twenty-eight years since *Huffey* was decided, this court has not considered another case involving a claim for tortious interference with inheritance or bequest. The absence of litigation regarding the issue is strong evidence the *Huffey* rule has been administered without much difficulty in the district courts for almost three decades despite its dubious logic.

There have been few developments in the law that would make continued adherence to *Huffey* untenable. The majority cites several considerations that favor overruling *Huffey*, but none of the cited considerations present anything new. The majority notes, "First, probate is meant to provide a prompt, efficient, centralized way of resolving issues relating to a decedent's estate and getting the estate distributed." This was true at the time *Huffey* was decided. The majority states, "Second,

undue influence is a well-developed probate concept." This was true at the time *Huffey* was decided. The majority explains, "Fourth, we question how an action for tortious interference with an inheritance . . . fits into Iowa's legislative scheme." The majority then discusses the legislative scheme. It is the same legislative scheme in place at the time *Huffey* was decided.

The majority's third rationale for overruling *Huffey* is simply disagreement with *Huffey*. The majority notes that the rationale of *Huffey* was not correct. The rationale the majority presents today is largely the same rationale offered by Chief Justice McGiverin in *Huffey*. *See* 491 N.W.2d at 523–27 (McGiverin, C.J., dissenting). The fact that a precedent was wrongly decided is not, in and of itself, sufficient reason to overrule the precedent. Stare decisis, as a rule of decision, only has force when a later court thinks a precedent was wrongly decided. Stare decisis thus demands something more. *Huffey* may have been wrongly decided, but there are no compelling additional reasons to overrule it now.

The district court relied on long-standing precedents in instructing the jury and ruling on the motion for directed verdict. I would adhere to these precedents under the doctrine of stare decisis. I would affirm the judgment of the district court on this ground alone. *See Book*, 860 N.W.2d at 594.